FRANCES A. BROWN, by her next friend, Respondent, v. THE
NEW YORK CENTRAL RAILROAD, Appellant.

For a railroad company to make what is denominated " a running switch "* over
    the crossing of the track by a public road, in the populous part of a village,
    is of itself, an act of gross and criminal negligence on the part of such com-
    pany.
Any person who, without negligence on his part, is injured at such crossing by
    the act of the running switch, may recover of such company for the damages
    sustained, without other proof of negligence than the act of making such
    running switch.

THIS action was brought to, recover for injuries sustained
by plaintiff by a collision of defendant's cars with a stage
coach, in which she was a passenger. The stage was a public
one plying between the villages of Albion and Batavia. The
collision occurred at the crossing over Main street in Albion,
which crossing, it appeared, was at a point of much travel
and in a densely built portion of the village. The stage was
moving south, and in approaching the crossing from the north
the view of the railroad is greatly obstructed by houses, trees,
shrubbery and fences, so that an approaching train cannot
well be seen till the traveler is within a few rods of the iron
track. The defendant was making what is called a "run-
ning switch," for the purpose of taking out of a freight train, a
car designed to be left at Albion. The switch is on the west
side of Main street, and to make the running switch the train
approaches with very considerable speed, and while so moving,
the car to be left from the train is disconnected, and the train
passes rapidly over the switch; the cars in the rear of the one
to be left are disconnected from it, and the speed of the rear

* To make "a running switch," a train approaches with considerable speed,
and while so approaching the car to be left is disconnected; the forward part of
the train then passes rapidly over the switch, the rear part is somewhat checked,
and the intermediate car to be left is switched off, and the switch is replaced in
season for the rear part of the train to unite with the front part thereof, without
stopping.

cars so far checked that the way car may be run off on a side track, and the switch set back to its place so as to allow the rear cars to follow the train. The way car and the rear cars are of course without signals, and a space of several rods intervenes between the parts so as to enable the switch to be properly moved and adjusted. The driver of the stage heard the approaching train when within a short distance of the track. He stopped his team and waited for the train to pass. While it was passing he started on, and had got within three or four rods of the rails when the single or way car came by. He again stopped his team for that to pass, and then started on a trot, and had got his horses' heads over the rails when he saw the rear cars coming some two rods from him. He instantly whipped his horses, and they started fast, and the cars struck the hind axle and wheel of the coach, causing the injury to plaintiff for which this action is brought. The plaintiff, amongst other things, received a severe contusion on the side of her head, and it was claimed her eye-sight was permanently injured. The driver testified that he was looking at the car that had just passed, and did not look east to see if more cars were coming, until just as his horses had got upon the track, when he saw them and started up as above stated. The plaintiff was confined to her bed for two weeks, and to the house for a week longer, and the external injuries remained some five or six weeks longer. She was, since the injury, affected with headache ; and her sight was injured so that she could not see evenings to read or sew, and she testified that her sight was good before, and she was not troubled with headaches.

Her attending physician was called, and testified to her condition. The following question was put to him : "If she was without headache and had good sight before, and has had headaches since down to this time at frequent intervals, or her sight affected, state your opinion as to the tendency of the injuries you saw to produce such results." The counsel for defendant objected to this question; the court overruled the objection, and the witness testified : That from the appearance there might have been such a concussion as would pro-

duce a serious injury without any more serious external injuries.  Headaches might result from such a cause.  A severe concussion of the brain might produce impaired vision. I think it possible the injury I discovered might produce such injury to the eye-sight.  There being no injury to the eye-ball itself, the injury, if it existed, would be from a concussion of the brain affecting the nerve.  I am unable to give any opinion as to how long that is likely to exist.

The mother of plaintiff testified that plaintiff had complained of headaches all the time since the injury.  Defendant's counsel objected to any testimony in relation to statements and complaints of plaintiff since the commencement of the action.  The objection was overruled and defendant's counsel excepted.

The defendant's counsel moved for a nonsuit upon the following grounds, to wit:

First. That plaintiff had failed to show that the injury complained of was occasioned without fault, on her part.

Second. That the evidence showed that Thomas, who was employed by plaintiff, was himself negligent, and that his negligence contributed to produce the injury.

Third. That the proof failed to show negligence on the part of the defendant.

Fourth. That upon the undisputed facts of the case, the plaintiff is not legally entitled to recover.

The motion was denied, and defendant excepted.  Several exceptions were taken to the charge, which are sufficiently referred to in the opinion.

The plaintiff had a verdict for $500.

*Strong & Mumford*, for the appellant.

*J. H. Martindale*, for the respondent.

1. The evidence in this case discloses great negligence on the part of defendant's agents on the occasion in question.

. The question is whether the court shall adjudge, as a matter of law, that in such a locality it is safe and proper to make "*a running switch*," that is, to divide the train into

three parts, the two rear parts being propelled by their own momentum, at the rate of twelve miles per hour, *without any signals of any kind;* this occurring in a densely settled part of a village of 3,000 inhabitants.

2. Thomas, the stage driver, was without fault. He used care enough to avoid the imputation of negligence. But whether so or not, the question is one of law and fact, if not of fact alone, and properly submitted to the jury.

3. But the plaintiff is not legally chargeable with any negligence imputed to Thomas, the driver. His employment was in its nature public, and his negligence could not be imputed to the plaintiff. He was not, in any sense, subject to her control. (See *Colgrove* v. *New York & New Haven Railroad Company,* 20 N. Y., 492; *Chapman* v. *Same,* 19 N. Y., 341.)

4. The testimony showing the nature and extent of the injury was competent; and whether the injury was curable or not, the damages were inadequate. (See *Caldwell* v. *Murphy,* 11 N. Y., 419.)

Davis, J. It is insisted by appellant that there was no evidence of negligence on its part which contributed to produce the collision; and that the court erred at the trial in denying the motion for nonsuit on that ground, and in submitting the question of defendant's negligence to the jury. On this question the point submitted to the jury was, whether the defendant exercised its right of making a running switch, at a proper place and with the use of due care. The place was certainly one demanding great caution. The crossing was over the street of a populous village where travelers were constantly passing. The view of approaching trains was, in a great degree, cut off by obstacles on the side of the street and along the line of the railroad. The act of making a "running switch" to cut out of a long train, a car, to be left, and to bring the remaining portions of the train together while moving at a rapid rate, evidently requires a good degree of care and skill; and if it be done over any public crossing, it must expose passers by to more than ordinary danger. A person

approaching a crossing and seeing an engine with a large number of cars attached passing rapidly by, would naturally suppose that the danger of collision had ceased. His eye would follow the receding train, the noise of which would be apt to drown that made by approaching cars; but if he found himself suddenly confronted by a car rushing by of its own momentum, his attention would be likely to be arrested by and attracted to that without thinking that more were to follow on their loose and unheralded career. I am at a loss to see how the defendant could justify the selection of such a place for the performance of what, under the circumstances, appears to me to be so dangerous an act; and more particularly to see any ground on which a court could adjudge, as matter of law, that it was safe and proper in such a locality, to make a running switch, whereby one train is detached into three parts, the two last propelled by their own momentum at a rapid rate over a much frequented thoroughfare, without signals or warning of any kind. In my judgment the act was gross negligence, for which I should hesitate to say the company could not be held to a criminal responsibility. There was evidence on the part of the defendant tending to show care in the manner of making the running switch on this occasion, and that it had been accustomed to make such switches at this point for some months, so that travelers might have had notice to some extent of their being made, which rendered the question a fair one for the jury; and it seems to me there was no error in submitting it to them.

It is also claimed to be error not to have nonsuited for the alleged negligence of the driver of the stage, and to have submitted the question of his negligence to the jury. The court charged the jury that the negligence of the driver must be regarded as the negligence of the plaintiff; that he represented her, and she could not recover in this action if his negligence contributed to produce the injury. Since the trial of this action, the decisions of this court, in *Chapman* v. *The New Haven R. R. Co.* (19 N. Y., 341), and *Colegrove* v. *N. Y. & N. H. R. R. Co.* (20 N. Y., 492), have been published. In the former of these cases, this court held that

a passenger by railroad is not so identified with the proprietors of the train conveying him or their servants, as to be responsible for negligence on their part, and could recover for personal injuries from a collision through negligence of the defendant, although there was such negligence contributing to the collision on the part of the train conveying him as would have defeated an action by its owners; and in the latter case, it was held that the injured passenger could maintain his action against the proprietors of both on the ground of their concurrent negligence. I do not perceive why these cases do not dispose of the question as to the negligence of the driver in this case. The plaintiff was a passenger in a public stage. She had no control of its management or direction; and occupied no relation to the driver different from that which passengers occupy to any public carrier of persons. In principle, there is no difference whatever between her relation to the carrier and that of a passenger on a train of railroad cars. The difference is one of fact merely, growing out of the difference of motive power and the corresponding necessity for more stringent rules and greater vigilance in one case than in the other. But a majority of the judges are of opinion that the true rule, *in a case of this kind*, was laid down at the circuit. It becomes necessary, therefore, to consider the question in the same aspect in which it was presented at the trial. It is not pretended that there was any fault or want of care on the part of the plaintiff herself; and it seems to me there was no error in submitting the question of the driver's negligence to the jury. As he approached the crossing and heard the train, he stopped and waited. He started on when danger from it had passed, and had got very near the track when the first detached car came by; he stopped again, and when that had passed, suspecting no further danger, he drove on. His horses were on the track, and were trotting, when he saw the new danger: it was within two rods of him, and he quickly whipped up his horses to escape. Could he have more safely drawn back and stopped? It is impossible to tell. He was placed where there was no time to decide the question. His peril called into action his

instincts, and not his reasoning faculties; and, under such circumstances, the party who had put him in jeopardy is responsible, and not he, if he mistook the safest means of escape. (*Stokes* v. *Saltonstall*, 13 Pet., 181.)

It was no error, therefore, to leave it to the jury to say, whether, under all the circumstances, the driver was negligent in attempting to escape by crossing the track. But was it negligence not to have seen the cars by which his carriage was hit, in time to have stopped? They gave him no warning. He had seen a train pass, and had stopped for it: a single car following at a distance from it, and had waited for that. These had attracted his attention, his eye naturally following them. Was he bound to suspect that more were coming, and be on the lookout for them? I think it is asking too much to say that it was negligence, as matter of law, not to have anticipated that detached cars were following in the rear of the train that had passed. The signals of the train had told him where the danger was, but gave no warning of unsignaled danger to follow.

It was not error to submit to the jury the question whether the injury to the plaintiff's sight was permanent or not. There was slight evidence on the question, and the court gave the jury a caution on the subject, which the amount of the verdict shows they did not fail to heed.

There was no error in allowing proof that plaintiff complained of suffering from headache and defective sight. The fact of making complaint in such cases is admissible. (*Caldwell* v. *Murphy*, 1 Duer, 233; *S. C.*, 1 Kern., 416, 419, per DENIO, J.; 1 Greenl. Ev., § 102; *Aveson* v. *Kinnard*, 6 East, 188; *Bacon* v. *Charlton*, 6 Cush., 581.)

But as the fact of plaintiff's suffering from those causes was distinctly proved and not controverted, no harm could have resulted from the evidence, if not strictly admissible.

In my opinion, the judgment should be affirmed.

DENIO, Ch. J., WRIGHT, PORTER and BROWN, JJ., concurred in affirming the judgment. DAVIES and CAMPBELL, JJ., dissented. POTTER, J., took no part in the discussion.

## PREFERENCES ON THE CALENDAR.

In 1865 it was enacted that "actions in which executors and administrators are sole plaintiffs or sole defendants, and in which the appeal prevents the issuing of letters testamentary or of general administration, shall have preference in the Court of Appeals, and in the Supreme Court, at the General Term thereof, over all actions, except in criminal cases in which the people are a party, and may be moved out of their order on the Calendar upon notice of an intent so to do." (Laws 1865, ch. 218, § 1.)

The question of the construction of this act coming up at the call of the Calendar, the court determined that the only effect thereof is to allow cases in which the people are a party to have a preference, if moved, over those where executors and administrators are sole plaintiffs or defendants, and over those in which the appeal prevents the issuing of letters testamentary and of general administration. That the cases on the calendar would be called as printed.

June 14, 1865.