Robertson, Ch. J.
A dismissal of the complaint in this action upon the ground that the negligence of the deceased had contributed to his death was twice moved for, on the trial; first at the close of the plaintiff’s evidence, and again, after all the evidence in the case had been introduced. Two questions, therefore, arise: Whether there was an utter want of evidence upon that point, or if there was any, whether it was so conflicting as to require its submission to the jury; for if there was either no such evidence or there *87 was such conflict, the verdict, so far as regards such motions, must stand.
It seems to have been conceded on the trial that there was some evidence of negligence by the deceased, as that question was submitted to the jury. The degree of skill of the crew of the boat he was in, is only material upon the point whether they employed proper means to guard against and avoid the accident in question, while they were propelling a boat by oars on the estuary where it occurred. The navigators of every vessel, especially on so crowded a highway, have a right to assume and be governed by the assumption, that every one navigating every other vessel on it, has sufficient knowledge of navigation to avoid injury by collision where it can be done, and will adopt the ordinary means used for the purpose, subject, of course,' to those rules of navigation which have been adopted in consequence of the greater facility of controlling at a particular time one vessel in her course than another in a different one; or when they are propelled by different agencies. Even then, however, the managers of each vessel have a right, and are bound to assume that every other they meet will follow those rules. The deceased was undoubtedly chargeable with any neglect of his comrades, as well as his own, to do every act to avoid danger and insure safety, at least unless he did all he could to repair the deficiency. None of them stood in the light of either employer or employed to the other, it was a joint expedition, in which each was liable for the acts and omissions of the other, unless he took some separate step to repair or prevent the result of the negligence of the others. Indeed, even in a case of injury from the collision of vehicles, a late case in the Court of Appeals, (Brown v. N. Y. Central R. R. Company, 32 N. Y. Rep. 601,) greatly shakes, if it does not overrule the doctrine apparently laid down in Colegrove v. N. Y. and N. H. Railroad Co. (20 N. Y. Rep. 492; S. C. 6 Duer, 382,) and Chapman v. N. H. Railroad Co. (19 N. Y. Rep. 341,) that the negligence of those having,control of a vehicle, in which a mere passen *88 ger is at the time, by the collision of which, with another vehicle, he is injured, is not so imputable to such passenger as to defeat his right of action against either owner.
The grounds of the charge of negligence against the deceased, are two fold: First. That he or his comrades did not keep a proper look out, and Secondly: That they did not use the usual effective means to avoid the danger of collision when imminent.
The evidence on the part of the plaintiff and defendants is widely different as to the time when persons on board of either vessel actually saw the other, without regard to the time when they might have seen it, if a vigilant look out had been kept. And such evidence is not at all conflicting. Both of the survivors of the crew of the row boat (McLean and Sutton) testified that the steamboat was only ten or fifteen feet off, when they first saw her, which was only a second or two before she struck them, and that their attention was first directed to her by hearing the splash of the deceased’s plunge in the water. McLean had previously testified before a coroner’s jury that the boats were then thirty feet apart; but he corrected himself on the trial. Sutton, on cross-examination; stated that he saw, instead, of merely hearing, the deceased jump into the water, and that the boats were not then over from eight to ten feet apart, precisely as he had testified before the coroner’s jury. He heard a splash, McLean told him a boat was coming, and he advised McLean to sit still. The moment he saw it coming, he was thrown right out. A laborer on the pier at the foot of Sixteenth street, (Fitzpatrick) did not see them until they were only half the breadth of the court room in. which the trial was had, apart; which, by McLean’s estimate, was not over fifteen feet. Kean, the captain of a sloop lying at that pier, first saw them when they were only five or six feet apart, and Douglas, who was loading such vessel, did not see them until the row boat was nearly under the guards of the steamboat. She was pulling round to get into the eddy, and the steamboat was coming around close *89 in shore to such vessel, both boats being in the same line.
On the other hand a passenger, (Baker,) who was in the forward part of the steamboat when it arrived at Twelfth street, on its way to Hunter’s Point, saw the rowboat a “little ahead” of them, and inside of their course. He thought it took from a minute and a half to two minutes for the steamboat to have gone from 12th to 16th street. The pilot on board of the steamboat (Nelson) testified that when in the vicinity of 9th or 10th street he first saw the row boat inside of his course, opposite either 9th, 10th, or 11th street, about fifty feet from the bulkhead, lying perfectly still. He was farther out and kept on his course so as to clear them. Just as he came opposite to them, about a minute and half after he first saw them, being from forty to fifty feet apart, those in the row boat commenced to pull a little. He then pulled the head stop bell, when the wire broke. He then put his helm hard aport and called down the speaking trumpet to stop. He leaned out of the pilot house window and shouted out to those in the row boat to pull. The steamboat was stopped and he blew a long and heavy whistle with steam, before she struck the row boat. Baker testified that she stopped forty or fifty feet from the row boat, and that the latter was sixty feet off, when the captain called out to them to stop. The engineer (Davis) corroborated the pilot by testifying that he got a “ dead stop hell” to stop suddenly, and he stopped the engine; she might have made half a turn more afterwards. They lay there a few minutes (four or five) when he got a bell to go ahead, and went on. He also heard a voice calling him to stop. Baker also heard the whistle blown and the pilot halloo. The fireman of the steamboat (Doyle) testified that she was stopped and the engine unhooked. McLean, it is true, testified that the pilot was mistaken when he said they were lying still; but such a mistake was natural, considering the strength of the tide. None of the plaintiff’s witnesses saw or heard any alarm given on board of the steamboat, nor did they see her stop. McLean at first testified that the reason *90 he did not see the steamer sooner was on account of a bend in the river, but he afterwards attributed the difficulty to some schooners outside the wharves. Sutton testified that they could not see down the river farther than 12th or 13th street, which was three or four blocks (of two hundred feet each) below where they first saw her. He did not see the ferry boat coming; he was looking up the river, and the deceased was looking sometimes up, sometimes down it. If they “had seen the boat at thirty feet distance” they “ might have got out of the way.” The bulk of the evidence seemed to show that the row boat was about forty or fifty feet from the 16th street wharf when her crew first saw the steamboat; and the plaintiff’s witness, Kean, testified that from that distance they could have seen down the river half a mile.
All this evidence, taken together, establishes plainly and without contradiction that the steamboat was not seen by the crew of the row boat, when she first came within the range of their vision, and that such failure to see her was the consequence of a want of a proper lookout by them. There is no evidence to disprove that when they came in sight of each other they were several city blocks or squares, being several hundred feet apart; that it took a minute or two for the steamboat, going at the rate of a mile in four minutes to overtake the row boat; that the pilot commenced to call out to those in the latter at the distance of sixty feet to row; that the steamboat was stopped at a distance of forty or fifty feet some minutes, and again started before the collision; and that the steamboat’s steam whistle was blown loudly; none of which things were seen, heard or known by any of the survivors of the crew of the row boat. The deceased was so taken by surprise that he sprang overboard without making a cry.
The distance between the boats had therefore been considerably shortened, and considerable time had elapsed before the crew of the row boat saw the steamboat and undertook to provide for their own safety. If, therefore, during that lost time, the crew of the row boat could easily have *91 taken measures for their safety and avoided all danger, an opportunity which they missed from want of vigilance, their negligence contributed to the disaster. Captain Kean testifiedthat if a row boat was forty or fifty feet off from a pier and saw a steamer coming, it could get out of the way. Sutton thought that if the steamboat had been distant thirty feet, they could have got out of the way. Baker, • who was a lighterman, testified that even if the helmsman “ had put his helm hard astarboard, and the man at the oars had kept on rowing, she could have escaped.” Fitzpatrick testified that there was “ a big current and a heavy tide there, always. It comes down from Seventeenth street and strikes the corner there and flows out into the center of the river;” and that “the boat being swept along” by that tide, Sutton says he “let go the rudder and the tide threw them round.” Nelson stated that “the tide struck the back part of the row boat and swept it towards” his boat. “ They let themselves drift right towards his boat. The row boat struck near the bow of the steamboat and drifted along its side under the wheel” McLean testified that the tide turned them right round, when within ten or fifteen feet of the steamboat, which was the same distance at which he first saw her, and that they “ could not have' escaped even if Sutton had not pulled the rudder wrong, because of the strong tide that was against” them. The deceased, therefore, by not having sooner seen the steamboat, incurred this new difficulty which rendered his boat unmanageable by getting into this strong tide-way at the foot of Sixteenth street and letting it drift against the steamboat. If they had seen the steamboat at Twelfth street, before getting into such a current, they could undoubtedly have turned towards the still waters near the shore, out of the line of the steamboat’s course, and so escaped all danger. It certainly would have been little short of madness deliberately to have attempted to make head against the current in question, with oars, and keep in advance of the steamboat, going at the rate of a mile in four minutes while rounding the pier, if they had *92 seen her. Their failure to see her before was owing entirely to want of vigilance on their part.
I see no reason why the usual rule in cases of maritime collisions which presumes against the vessel which has not a proper look out should not equally apply to the present case, although only a row boat is involved. The defendants had such a lookout, and endeavored to signal to, and avoid collision with, the deceased’s boat. If through inattention, the crew of the latter did not see the boat or hear the signals, the fault lies with them. The managers of the steamboat had a right to suppose when the oarsman in the row boat continued to row and the helmsman to keep it directly in their track, that the crew had sufficient self-confidence in their skill and ability to escape all peril. ■ They were not bound to anticipate the fit of panic that overtook them at the moment of the greatest danger, or assume that the oarsman would stop rowing and the helmsman abandon the helm at the most critical period, in the midst of an overpowering current. Upon this ground, therefore, I think, the deceased was chargeable with the negligence of his comrades and his own, particularly as the plaintiff is bound to explain every adverse circumstance and disprove negligence. (Button v. Hudson River R. R. Co., 18 N. Y. Rep. 248.)
If the crew of the row boat had seen the steamboat as soon as those on board of the latter saw them, they would have been guilty of negligence in not taking proper precaution to keep out of her way before getting into the tremendous tide-way at the foot of Sixteenth street, which she had power to stem and they had not. This was the only part of the management of the boat for which the deceased was not responsible, as he sprang overboard, before the rowing was stopped or the rudder quitted.
Eor these reasons alone, I think the defendants are enti- ■ tied to a new trial. But an exception was taken to a refusal to charge, which I think should also be sustained. The defendants’ counsel requested the court to charge the *93 jury that the burden of proof of the negligence of the defendants -lay on the plaintiff. This must be the true rule even if the circumstances of the case otherwise establish such negligence. (Button v. Hudson River R. R. Co., 18 N. Y. Rep. 248.) The deceased came to his death by drowning, having plunged voluntarily into the water, to avoid being run over by the steamboat. Surely, whether the peril was caused by the negligence of the defendants must be a matter of affirmative proof, as an essential part of the cause of action. And this is the more essential in this case, because the learned judge charged the jury that the velocity of the steamboat’s motion might be some evidence of negligence and a reason for supposing they were negligent in the management of their boat, which I apprehend to be contrary to settled principles. (Wilds v. Hudson River R. R. Co., 29 N. Y. Rep. 326. S. C. 24 id. 430. Ryan v. Fowler, Id. 410. Sherman v. Rochester and S. R. R. Co., 17 id. 173. Boldt v. N. Y. Central R. R. Co., 18 id. 432.)
The judgment should be reversed, and a new trial had, with costs to abide the event.