ELBRIDGE G. YORK, Administrator,

*vs.*

MAINE CENTRAL RAILROAD COMPANY.

Penobscot.    Opinion December 16, 1891.

*Negligence. Railroad. Flying-Switch. Instructions.*

Whether a railroad company is negligent in severing a train into two parts, and making a flying-switch over a highway crossing, is a question for the jury.

Whether a traveler upon the highway, who sees the first section of the severed train pass over the crossing, is negligent in attempting to cross the track, without looking or listening for the rear section of the train, is also a question for the jury.

The presiding justice at a jury trial has full discretionary power to suggest to the jury possible solutions of seeming difficulties, and possible harmonics of seeming discrepancies in the evidence, even though counsel do not.

ON MOTION AND EXCEPTIONS.

This was an action on the case which Ida M. York brought against the defendant corporation to recover damages for personal injuries which she received July 31, 1888, caused by the rear division of a freight train making a flying-switch at a grade-crossing near East Newport. She having died before the trial, her administrator prosecuted the suit. The case proceeded to a trial on a plea of the general issue. The jury returned a verdict of thirteen hundred dollars for the plaintiff.

The plaintiff's declaration is as follows:

"In a plea of the case, for that the defendant corporation on the 31st day of July, A. D., 1888, was possessed of a certain railroad extending through Newport, in the County of Penobscot, aforesaid, and was then in full occupation of said railroad thereon running locomotive engines and cars, and had the control, management and direction of said railroad and the engines and cars on the same. Said railroad in its course through the town of Newport, aforesaid, at a point about one half mile west of East Newport station then crossed and now crosses at grade a public road in said Newport which leads from Newport village, so-called, easterly through Newport, aforesaid, to the town of Stetson. The crossing aforesaid is commonly known as Col--

cord's crossing. And on the day last aforesaid, to one riding over and along said public road and having approached from the west near to said crossing, the view therefrom of said railroad westerly of and near the crossing aforesaid, and of cars upon that part of said railroad was greatly hindered and obstructed by a house, trees and bushes.

"The public road aforesaid westerly of and near to said crossing, beginning at a point about three hundred feet distant therefrom, there made for the space of two hundred feet quite a sharp descent towards the crossing aforesaid. Between the foot of the aforesaid descent and very near to the westerly side of said crossing, there then were steep embankments on each side of the travelled part of said public road and rails along each side of the public road, aforesaid, at the top of said embankment. On the day last aforesaid the defendant corporation had only a single track, to wit., its main track over said crossing and for a long distance westerly thereof, and but a single track for a considerable distance easterly from the crossing, aforesaid, to wit., nine hundred feet.

"On said last day of July, A. D., 1888, the plaintiff was riding alone in a carriage from Newport village, aforesaid, easterly over and along said public road towards said crossing and was guiding and directing the horse harnessed to said carriage. And when the plaintiff so then riding as aforesaid along said public road had got near to said crossing, a locomotive engine drawing a train of cars thereto attached, belonging to the defendant corporation and then under its management, direction and control, approached said crossing from the west over said track at considerable speed, to wit., a speed of twenty miles an hour ; and when near the crossing aforesaid, to wit., one thousand feet westerly from it, the defendant corporation by its servants and agents carelessly and negligently divided said train of cars into two parts which parts were separated at said crossing by a considerable distance, to wit., three hundred feet : the engine and cars thereto attached passing over said crossing at the speed aforesaid, the cars detached from the engine passing said crossing rapidly but at somewhat less speed. The plaintiff

heard the whistle of said engine sounded for said crossing, and she having so as aforesaid approached near the aforesaid crossing waited, before driving or attempting to drive over it herself, for said engine and train of cars to pass it.   She saw the engine and the cars which were, after said division of the train, attached to it pass over said crossing.   She did not then know of the separation of said train of cars in two parts, and then and there believed and had good reason to believe that all the cars that were of said train, before its separation, had passed said crossing before she attempted to cross it.

"And thereupon the plaintiff, in her said carriage so drawn as aforesaid, attempted to drive in and along said public road over said crossing, and when close to it that part of the train of cars which had been so separated as aforesaid from the engine and cars attached to it came rapidly to and onto said crossing without previous warning or notice of its approach, and she in her attempts to avoid a collision with said cars was thrown with great force and violence out of her said carriage onto the ground, and thereby then and there her left clavicle was broken and she was greatly bruised, sprained and hurt in body and limbs, and thereby she then and there received a great shock and injury to her nerves, from the effects of all which she has since suffered and now suffers great pain of body and mind, and her left shoulder has been permanently injured, and her health has been destroyed, and she has been put to considerable expense for medicine and medical services and nursing in attempts at relief and cure.

"And the plaintiff says that before and at the time and place of said accident and injury she was in the exercise of due care and diligence, and that the aforesaid accident and injury was in no way her fault, or attributable to any fault or defect in her horse, harness or carriage, but was wholly caused by the fault and negligence aforesaid of the defendant corporation, to the damage of said plaintiff," &c.

The exceptions are stated in the opinion.

*Jasper Hutchings,* for plaintiff.

*Wilson and Woodard,* for defendant.

Contributory negligence : *Lesan* v. *M. C. R. R. Co.* 78 Maine, 346, 353 ; *Hooper* v. *B. & M. R. R.* 81 *Id.* 260, 267 ; *Allen* v. *M. C. R. R. Co.* 82 *Id.* 111.

An instruction to the jury inapplicable to the facts of the case, and calculated to have an influence on the verdict, although correct when applied to other facts, is an error sufficient to cause the verdict to be set aside. *Pierce* v. *Whitney,* 22 Maine, 113.

In strictness, an opinion expressed by the judge upon a question of fact on trial before a jury, is not open to exception ; but if the party against whom it operates yields to it and does not choose to argue against the weight of it, the court may in its discretion grant a new trial if the opinion was incorrect. *Curl* v. *Lowell,* 19 Pick. 25.

Here there was no opportunity for the party against whom this suggestion operated to argue against the weight of it, as it was made in the closing charge of the judge to the jury.

Anything in the remarks or instructions of the presiding judge to the jury, even if it does not constitute a valid ground of exception, can be made available under a motion to set aside the verdict when it appears upon a report of the whole case that the verdict was manifestly wrong and that the suggestions of the judge may have misled the jury. *Stephenson* v. *Thayer,* 63 Maine, 143, 146.

EMERY, J.   This is an action of the case counting on the defendant's negligence, in running a train past a highway crossing at East Newport, whereby the plaintiff's intestate, a traveler upon the highway, was injured. The verdict of the jury was for the plaintiff, and the defendant has moved to set aside the verdict as against evidence and has also excepted to one ruling of the presiding justice.

From the evidence reported the following facts may be gathered. The crossing is a short distance west of the East Newport station. The railroad and the highway (from Newport to Stetson) approach the crossing in gradually converging lines and for half a mile or more before reaching the crossing are nearly

parallel.  Near the crossing the railroad curves gradually to the south and crosses the highway at angle of about thirty-three degrees.  The grade of the railroad is descending all the way.  The grade of the highway is nearly level to the brow of a hill about three hundred feet from the crossing.  It there descends to within about fifty feet of the crossing, where it again becomes nearly level.  The drop from the top to the bottom of the hill is about fifteen feet.  About twenty rods west from the crossing, and between the highway and the railroad is the dwelling-house of Mr. Colcord.

A traveler on the highway going east had a near and plain view of the railroad on his left for upwards of half a mile before reaching the Colcord house.  Near that house, the view became more or less obstructed by an orchard, the house and outbuildings, bushes, wood piles and high land, the railroad and the highway both running somewhat in a cut down the hill.  At a point on the highway some seventy-five feet west of the crossing the traveler could plainly see back on the railroad track some three hundred feet westerly.

Such being the situation, Miss York, the plaintiff's intestate, was alone in a top-carriage driving along this highway easterly toward this crossing.  The defendant's freight train of twenty-three cars came along at the same time at a speed of about fifteen miles an hour.  She undoubtedly heard the whistle and the train coming up behind her.  She may not have looked back but she was clearly apprised of the train's approach to the crossing.  She drove on at a gentle trot down the hill past the Colcord house and presently saw the locomotive and several cars pass on ahead of her over the crossing, and leave the crossing clear.  But some four hundred feet back from the crossing, the defendant's servants in charge of the train severed the train in order to make a flying or running switch, at East Newport station.  The locomotive and tender with four cars passed rapidly on, and the remaining cars followed more slowly, impelled only by gravity and the momentum, and uncontrollable except by the ordinary hand brake.  When the first section of the train passed the crossing, the rear section was from one hundred

to one hundred and seventy-five feet behind.    No necessity was shown for making this flying-switch across the highway.

Miss York evidently did not see or hear this rear section, for after the passage of the first section she drove along to the seemingly clear crossing, to pass it.    The rear section, however, rushed on from behind upon the crossing, causing the horse to suddenly swerve to the right and throw out Miss York to her injury.    There were no gates nor flagmen at this crossing. The brakeman on the rear car of the first section testified to making signs to Miss York of the danger of crossing there ; but it does not appear that she understood or even saw these signs. There was also evidence of other minor circumstances which it does not seem to us necessary to state.

Two questions of course were directly involved in the trial of this case.    1.  Was it negligence in the defendant company to separate its train to make a flying-switch over that crossing ?    2. Was it contributory negligence in Miss York, the plaintiff's intestate, not to look back up the track for possible cars or trains when she arrived at the crossing ?

Negligence may consist of the doing an act, which a reasonable and prudent man mindful of his own conduct and of the safety and rights of others, would not ordinarily have done under all the circumstances of the situation ; or it may consist of the omission to do an act which such a person under the existing circumstances would ordinarily have done.    The duty to do or not to do is measured by the usual conduct of reasoning, prudent men and by the exigencies of the occasion.    The standard of duty is what thoughtful, prudent men, mindful of themselves and of others, might reasonably be expected to do or not to do under all the circumstance of the particular case.    The type is not the very prudent, the very circumspect man, but the man who answers to the popular conception of a prudent, reasonable man.    The thing to be done or left undone is what would seem to such men to be suggested by all the appearances, probabilities and other circumstances of the time, place and events.

All such circumstances may be undisputed, and in such case the only question is whether the act or omission under consider-

ation comes up to the above stated legal standard of duty, or falls below that standard and into the class of negligent acts, or omissions. In our system of jurisprudence the determination of this last question is within the province of the jury. Not only is it the duty of the jury to ascertain what was done or omitted, and all the attendant circumstances, but it is also the duty of the jury to determine whether under all those circumstances the act or omission was up to the standard or was negligent. The theory is, that twelve men of the average of the community, conversant with every day affairs and with what men do and don't do; more or less familiar in their own experience with similar circumstances and conditions and with the usual conduct of men under them,— coming together into consultation from various modes of life, occupations and points of view,— and applying their separate experiences and observations, can by their unanimous conclusion form the best attainable judgment upon such a question. Twelve men of affairs, such as juries are supposed to be composed of, would naturally have a wider experience, and broader observation, in such matters than any single judge, however learned.

In some cases, however, the act or omission under all the circumstances, may be so plainly and indisputably negligent or otherwise, that there can be no need to ask for the judgment of the jury upon the question. As said by the Chief Justice in *Lasky* v. *C. P. R. R. Co.* 83 Maine, 470, when the facts are undisputed, and the conclusion to be drawn from them is indisputable, the question may be determined by the court.

For instance, if a railroad company should make a flying-switch across a frequented street in the night time, without providing any signal of danger or giving any notice of the approach of the rear section, such an act measured by the standard would be unmistakably and indisputably reckless or negligent. *Delaware, etc. R. R. Co.* v. *Converse,* 139 U. S. 467. Again, if a traveler upon a highway approaching a railroad crossing where there are no indications that a train may be expected, should omit to look or listen for a train, his omission, unexplained, would be so clearly negligent, the

court would not hesitate to take the case from the jury. *Chase* v. *M. C. R. R. Co.* 78 Maine, 346.

To apply these principles to the facts above stated:

1. The railroad and the highway being nearly parallel for some distance, and crossing at an acute angle, the train came up behind the traveler, so that a traveler near the crossing would have to look back over his shoulder to see what was coming on the track. There was more or less obstruction to the the view from a point fifty feet distant from the crossing back some three hundred feet on the highway. The highway was a thoroughfare between two towns, one of them at least of some importance. The men in charge of the train saw the traveler in a top carriage approaching the crossing. There was no flag man, or other means of giving warning at the crossing.

Was it a prudent act under these and all the other circumstances for the train men to make that flying-switch at that time and place? Would a prudent man be reasonably expected to do that act, assuming him to be reasonably prudent and mindful of the rights of others? The jury under full, clear and correct instructions have answered in the negative.

2. The plaintiff's intestate, Miss York, had presumably seen and heard the train as it came up behind her. She saw a locomotive and several cars pass on across the highway and leave the crossing clear. She could rightfully suppose that the railroad company did not permit trains to follow within five minutes of each other. Such indeed is the well-known rule. Seeing the crossing cleared by the passing train, she drove on in her turn. By turning her head partly round to look over her left shoulder she could have seen the rear section of cars also approaching the crossing. She did not so look back. Was it contributory negligence in her — not to do so? Was there any reason to apprehend the passing of another train,— or section of train,— at that moment, one having but just passed? Would a reasonably prudent person under all the circumstances be reasonably expected to look back? The jury has answered these questions also in the negative.

The question for us now is not whether in our opinion this

conclusion reached by the jury is right. We may not ourselves think it right, but such an opinion alone would not authorize us to reject the jury's judgment. The question for us is, whether this conclusion, this judgment, could be arrived at by fair-minded men by any reasonable inference from the evidence, even though other and contrary inferences might seem to us more reasonable. To set aside the verdict of the jury is to say that the inference drawn by the jury is indisputably wrong,— that no such inference can be fairly drawn by any fair-minded men,— that the contrary inference is not only the more reasonable inference but is the only reasonable inference.

It seems to us that the very statement of the case, and the question, shows we ought not to assume so much. In *Delaware, etc. R. R. Co.* v. *Converse,* 139 U. S. 467, above quoted, the justices of the U. S. Supreme Court declared that in their opinion, the railroad company was plainly negligent in making a flying-switch across a highway in the evening, and they declined to say that the traveler was negligent in not looking back for the rear section. In *Phillips, Adm'x,* v. *Milwaukee, &c. R. R. Co.* 77 Wis. 349, the railroad crossed the street with its main track and some switch or side tracks. The plaintiff's intestate approaching the railroad saw a train of cars pass across the street to the west. He then started across the track and was killed by two cars which had been "kicked" back without warning from the train just passed. He evidently did not look along the track to the west at the moment of crossing. The justices of the court declined to say that the jury drew wrong inferences in returning a verdict for the plaintiff. *French* v. *Taunton Branch R. R. Co.* 116 Mass. 537, was very similar in its circumstances to the case now at bar. The railroad company made a flying-switch across a highway as a traveler was approaching the crossing. The traveler (a woman), saw the locomotive and some of the cars pass over the crossing, and then started to cross in her turn, without looking up or down the track, although she could have seen some distance either way. She was struck upon the crossing by the rear section of the train and injured. The court would not say that it was

unreasonable for the jury to find the defendant guilty of negligence and the plaintiff free from contributory negligence.    For further instances see :    *Bonnell* v.  *Delaware, etc. R. R. Co.* 39 N. J. L. 189 ; *Randall* v. *Conn. River R. R. Co.* 132 Mass. 269 ; *Brown* v. *N. Y. C. R. R. Co.* 32 N. Y. 603 ; *Duame* v. *Chicago, &c. R. R. Co.* 72 Wis. 523.

It is true that a traveler upon a highway before crossing a railroad should look and listen for approaching trains.    It is usually clear, indisputable negligence in the traveler not to do so, as has been repeatedly held by this court. *Chase* v. *M. C. R. R. Co.* 78 Maine, 346, and cases cited.    If nothing indicates to the contrary, trains of some kind or at least locomotives are liable to pass at any moment, and the traveler should be continually on his guard against them.

But sometime there may be indications that nothing will pass along the railroad for some minutes at least.    The gates (where there are gates) may be up, a standing assurance to the traveler that no cars or engines are coming.    *Hooper* v. *B. & M. R. Co.* 81 Maine, 260.    The retiring of a flag-man from the crossing may inform the traveler that he may now cross safely.    In view of the well known and necessary rule requiring considerable space and time between successive trains, the passage of one train may be an indication that no other will pass the same way for some minutes.    These and other acts upon the part of the railroad may throw the usually prudent traveler off his guard, and free him from the reproach of negligence in attempting to cross at such a time.

The defendant's counsel strongly urges that the defense before the jury was unduly prejudiced by a suggestion made by the presiding justice in the course of his charge.    It was one theory of the defense that Miss York's horse was frightened by the whistle and first approach of the train, and became unmanageable from the beginning, and before she could get him under control, threw her out.    This theory was based on the testimony of witnesses as to Miss York's statements to that effect after the injury, as no one seems to have observed that the horse was unmanageable.    The testimony by these witnesses was that she

said she heard the train and the whistle, and the horse heard the
train, and started up and she could not control him.   The plaint-
iff's theory on this point was that the horse was not frightened
until he encountered the rear section at the crossing.   In sup-
port of this theory, there was testimony that Miss York stopped
the horse a little way from the crossing and only started him
again when she saw the first section go by.

There was apparently a flat contradiction.   If Miss York
stopped the horse according to some witnesses, it was exceed-
ingly improbable that she made the precise statements testified
to by other witnesses.   An unskilled or unreflecting person
might at first conclude there was perjury somewhere.   But it
was the duty of the court and jury to be cautious of inferring
perjury from seeming contradictions.   It was the duty of both
to attribute such contradictions to mistakes and misunderstand-
ings, rather than to dishonesty.   In this case, upon this point, the
presiding justice said :   "If she made the statements claimed by
the defense, to what time do they refer?   Do they refer to the
time when she was driving down the hill, or do they refer to the
time when she started, if she did start after stopping, and
attempted to go across the crossing?   It may be possible that
her horse became uncontrollable after she stopped, if she did
stop, and when she attempted to cross the track near the
detached portion of the train."

This language was a suggestion of a possible explanation of a
seeming contradiction, a suggestion of a possible harmony in
the facts consistent with the integrity of all the witnesses.   It
was a suggestion that Miss York might have stopped her horse
as testified by some witnesses, and yet have said to the other
witnesses, that her horse was frightened.

The defendant's counsel contends that this explanation, this
possible harmony was not suggested by anything in the evidence,
and would not have occurred to the jury had it not been sug-
gested by the presiding justice.   He further contends that, as
the plaintiff's counsel did not allude to any such explanation
nor make any such point, it was improper for the presiding
justice of his own motion to make the point, and suggest the
explanation.

We think the explanation, the possible harmony, would occur to a skilled, reflecting mind in analyzing and comparing the different parts of the evidence. From what other source than the evidence could it have come to the presiding justice? We also think the presiding justice in communicating the suggestion or thought to the jury was clearly within the limits of his official power and duty. A judge presiding in a court of justice occupies a far higher position and has vastly more important duties than those of an umpire. He is not merely to see that a trial is conducted according to certain rules, and leave each contestant free to win what advantage he can from the slips and oversights of his opponent. He is sworn to "administer right and justice." He should make the jury understand the pleadings, positions and contentions of the litigants. He may state, analyze, compare and explain evidence. He may aid the jury by suggesting presumptions and explanations, by pointing out possible reconciliations of seeming contradictions, and possible solutions of seeming difficulties. He should do all such things as in his judgment will enable the jury to acquire a clear understanding of the law and the evidence, and form a correct judgment. He is to see that no injustice is done. If a valid defense is disclosed by the evidence, and is admissible under the pleadings, and yet escapes the notice of the defendant's counsel, that defense should be stated to the jury by the presiding justice. If the plaintiff's counsel omits to comment upon or urge an answer to a defense, which answer is disclosed by the evidence and is available under the pleadings, the presiding justice may properly call attention to it. He should so conduct the trial that no truth is overlooked and no right is forgotten.

To do all these things he must necessarily have a large discretion. Such discretion must exist somewhere and the law lodges it with the presiding justice of the court. It is a part of his official power, for the proper exercise of which he is responsible to the people.

*Motion and exception overruled.*

PETERS, C. J., VIRGIN, LIBBEY, FOSTER and WHITEHOUSE, JJ., concurred.