**STATE of Maine**

v.

**James E. LEWISOHN.**

Supreme Judicial Court of Maine.

Nov. 8, 1977.

Vernon I. Arey, Asst. Atty. Gen., Augusta, for plaintiff.

Bernstein, Shur, Sawyer & Nelson by Peter J. Rubin, Barnett I. Shur, Portland, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DUFRESNE, Active Retired Justice.[1]

On June 2, 1974 the defendant, James Lewisohn, and his wife, Roslyn, had guests for dinner at their home in Cape Elizabeth. Their visitors left early in the evening. Following their departure, the defendant set out for a Portland restaurant and cocktail lounge which he reached by hitchhiking. When the place was about to close, Mr. Lewisohn invited several of his acquaintances whom he had met at the restaurant to come to his home in Cape Elizabeth. They did and remained with him until some time before 2:00 a. m. Their testimony indicated that, as the night wore on, the defendant became vociferous and animated in his speech. Several said that he appeared to be under the influence of intoxicating liquor.

Shortly after his last guest had left, Lewisohn yelled to his wife to come help with the dishes. She shouted back: "Jimmy, Jimmy, stop it. Stop laying trips on me." She rose from her bed, however, and walked into the kitchen. Seconds later, the couple's young daughters heard a loud bang and the sound of breaking glass. The defendant had shot his wife in the shoulder with a 9 mm. handgun.

Lewisohn's younger daughter, aged 10, who had been asleep in a second floor bedroom, reached the kitchen first and observed her father kneeling beside her wounded mother on the floor. She heard her mother cry: "Jimmy, call the hospital, I'm bleeding." She stated that her father then got up and said: "If it will make you happy, I'll shoot myself; at least we will die together." She added that her father then shot himself.

---

1. Mr. Justice DUFRESNE sat at argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr.

Chief Justice McKUSICK, was empowered and authorized to continue his participation in the case in his capacity of Active Retired Justice.

The other daughter, aged 14, then appeared from her basement bedroom and, observing her mother and father lying on the kitchen floor, telephoned for medical assistance. The defendant's wife was pronounced dead on arrival at the Maine Medical Center.

The defendant was indicted by the Cumberland County Grand Jury for felonious homicide punishable as murder (17 M.R.S.A., § 2651), to which charge he entered dual pleas of not guilty and not guilty by reason of mental disease or defect. His motion for bifurcation of the trial was granted.

The defendant based his defense on misadventure or accidental shooting, contending that he unintentionally shot his wife while handling the gun with the intention to clean it. The traverse jury rejected this particular version of the defendant's explanation and brought in a verdict of guilty of the murder of Roslyn S. Lewisohn, his wife, as charged in the indictment.

On the second portion of the trial, the jury concluded that the unlawful homicide was not the product of mental disease or defect and found the defendant criminally responsible for his act.

The defendant appeals his conviction and sentence of life imprisonment, raising in his points on appeal several claims of reversible error which he contends the trial Justice committed. He directs his attack in the following areas: 1) the trial Court's decision respecting his pretrial motion to suppress, 2) rulings on admissibility of evidence, 3) instructions to the jury, 4) omissions to charge requested instructions, 5) the denial of the defendant's motion for acquittal, and finally 6) evidentiary rulings and jury instructions at the second stage of the bifurcated trial. We deny the appeal.

### Pretrial Motion to Suppress

It was shortly after 2:00 a. m. in the morning of June 3, 1974 when Officers Tolan and Tinsman of the Cape Elizabeth Police Force, while on separate patrols, received a radio message regarding a possible homicide at 29 Angell Terrace, the defendant's residence. Responding to the call, the officers arrived at the defendant's home at approximately the same time. The defendant's fourteen year old daughter was at the front door, pleading for help and crying that "they" were dying. While Officer Tinsman returned to the police cruiser to get oxygen, the young girl escorted Officer Tolan through the front door, across the living room, along a short hallway and into the kitchen. Upon entering the kitchen, the officer immediately observed the defendant and his wife lying on the floor. Examining the wife, he found a small amount of blood underneath her right shoulder. Turning his attention to the defendant, Officer Tolan noticed a gunshot wound in his abdomen. As he kneeled beside the defendant, he pushed away a small shag rug. This exposed a 9 mm. handgun.

When he observed the defendant's wife, he detected no body motion nor any sign of life. His closer examination for the purpose of finding a pulse proved negative, a condition corroborated, so he stated, by the officer assisting him at the time. Oxygen brought no response. Thinking, however, the woman might have some type of chance of regaining life if she reached the hospital, Officer Tolan had her removed immediately by the Cape Elizabeth rescue squad. The defendant who was conscious was taken to the hospital shortly thereafter by the South Portland rescue unit.

After the bodies were removed from the home, Officer Tolan stated they proceeded to look around the kitchen and the adjoining rooms on the first floor. Appearing on the scene within one half hour, Police Chief DiTomaso of the Cape Elizabeth Police Department joined in the investigation of the first floor premises including the bedroom where the Chief saw in plain view on the bureau a brown holster and a clip and in the open second drawer thereof a .22 caliber handgun plus a box of 9 mm. ammunition. The scene was processed by the taking of photographs around 3:00 o'clock a. m., without the presence of the body of the deceased victim which had already been removed. These photos of the weapon, the

relevant kitchen and living room areas and the spent ammunition found in the kitchen were all admitted without objections at trial.

The trial Justice denied the defendant's motion to suppress several items seized by the police in the early morning hours of June 3, 1974 and taken from the Lewisohn home. The defendant, however, has narrowed his point on appeal to the articles seized and taken from the bedroom. This would involve the brown holster, the .22 caliber handgun and the box of 9 mm. ammunition. The State did not introduce this "real" evidence in the case as such, but the defense argues that it was error to allow the same in evidence by way of oral descriptive testimony of Detective Greeley of the Maine State Police who reached the Lewisohn home about 1½ hours after the Cape Elizabeth police had started their investigation and who viewed these same objects in place in the bedroom at the request of Police Chief DiTomaso. The seizure was actually made one hour after Detective Greeley joined the investigation.

■ Oral testimony respecting physical tangible objects the knowledge of which has been obtained by or through an unlawful search or seizure is equally inadmissible in evidence as the physical tangible objects themselves. Verbal evidence as to matters observed during a constitutionally unlawful police intrusion into one's home must on objection be excluded at trial in order to enforce and give meaningful effect to the basic constitutional privileges provided by the Fourth-Fourteenth Amendments. *Wong Sun v. United States*, 1963, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441; *State v. Wade*, 1968, 99 N.J.Super. 550, 240 A.2d 689, 692; *McGinnis v. United States*, 1955, 1 Cir., 227 F.2d 598, 603; *Ross v. Commonwealth*, 1955, Ky., 275 S.W.2d 424; *State v. Hunt*, 1955, Mo., 280 S.W.2d 37, 40; *Todd v. State*, 1954, 233 Ind. 594, 122 N.E.2d 343; *Dalton v. State*, 1952, 230 Ind. 626, 105 N.E.2d 509, 512.

The State justifies the bedroom search without a warrant on the case of *State v. Chapman*, 1969, Me., 250 A.2d 203, where this Court said:

"The interest of society in securing a determination as to whether or not a human life has been taken, and if so by whom and by what method, is great indeed and may in appropriate circumstances rise above the interest of an individual in being protected from governmental intrusion upon his privacy. [Id. p. 210]

\* \* \* \* \* \*

"We are satisfied that if the police cannot, after lawful entry, make the sort of prompt, orderly and methodical investigation of the scene of a violent death that is here shown, the protection of the legitimate interests of society will be seriously weakened." Id. p. 212.

■ We recognize that the search in the instant case is far from being as extensive in space and time as the search in *Chapman*. But justification for it must be based on the same principles. We hold that the original warrantless police entry was proper as being made in exigent circumstances for the purpose of saving life upon the report of a possible homicide, the need for providing emergency care and early hospitalization to victims of violent crimes being present.

"When the attending circumstances indicate to the officer as a reasonable and prudent person that any delay attendant upon securing a search warrant might mean the difference between life and death for the person within the home, the constitutional requirement of the fourth amendment must give way to the paramount duty of the officer to preserve a human life. *Davis v. State*, 1964, 236 Md. 389, 204 A.2d 76." *Chapman*, supra, (Dufresne, J. dissenting) at 215.

See also *State v. Davidson*, 1969, 44 Wis.2d 177, 170 N.W.2d 755, 764.

■ It is true that in *Chapman*, the victim was officially pronounced dead by the medical examiner while the body remained in the home. There was no immediate removal to the hospital as in the instant case, but the evidence in this record points to the only conclusion possible that at the time of removal of the body Mrs. Lewisohn had

already succumbed to her injuries and that such removal was in violation of 22 M.R.S.A. § 3025 (formerly § 512).[2] Thus, as in *Chapman,* the issue in the instant case is, whether the police officials, after having gained lawful entry into the defendant's home initially, even though they had no official warrant to do so, had then the right to make a thorough investigation and inspection of the premises in which an apparently violent death had occurred and a criminal homicide might have been committed with authority to search without first procuring a search warrant.

In *Chapman,* this Court did say that where the appearances were strongly suggestive of the possibility of violent death or homicide, it became the duty and obligation of the police to make such a thorough investigation to determine whether the decedent was the victim of foul play and if so by whom and by what means. This was labeled "processing the scene."

In reaching its decision, the *Chapman* Court relied heavily upon *United States v. Rabinowitz,* 1950, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653, where the United States Supreme Court had said:

> "The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. * * * The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case." (Emphasis in original)

The *Rabinowitz* view has now been discarded for overlooking the express warrant clause of the Fourth Amendment. See *United States v. United States Dist. Ct., E.D. of Mich., S.D.,* 1972, 407 U.S. 297, 315, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752; *Chimel v. California,* 1969, 395 U.S. 752, 766, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685, 695.

Since our *Chapman* decision, the authorities in factual situations nearly identical are divided on the recognition of an exception to the warrant requirements of the Fourth-Fourteenth Amendments for full-scale on-the-scene-searches in homicide or potential homicide cases.

For jurisdictions following the *Chapman* rationale, see: *State v. Oakes,* 1971, 129 Vt. 241, 276 A.2d 18, 24, cert. denied 404 U.S. 965, 92 S.Ct. 340, 30 L.Ed.2d 285, where the Vermont Court stated: "The officers were confronted with the body of Mrs. Oakes and circumstances making it their duty to conduct an investigation on the premises. This, *of itself,* justified the search and the taking into possession of the related instrumentalities there present." (Emphasis supplied)

*Lonquest v. State,* 1972, Wyo., 495 P.2d 575, cert. denied 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299.

*State v. Sample,* 1971, 107 Ariz. 407, 489 P.2d 44, where the Arizona Court concluded: "The need for all citizens and particularly potential victims such as this to effective protection from crime, particularly

---

2. 22 M.R.S.A., § 3025 provides in pertinent part:

"Whoever finds the body of any person who is supposed to have come to his death by violence . . . shall immediately notify one of the municipal officers, a police officer or constable if in a city or town; . . . .. Such official shall immediately take charge of such body and retain custody thereof without moving the same, except as otherwise provided, until the arrival of a medical examiner, the county attorney, the sheriff or a member of the State Police. The official taking charge of said body shall immediately notify the county attorney, sheriff or any member of the State Police, who shall in turn arrange for the attendance of the most readily accessible medical examiner.

* * * If no such danger [of the body being destroyed or damaged] exists, the body shall not be moved until the arrival of a representative of the Attorney General and until photographs have been taken or measurements and drawings have been made to record the physical facts relative to the location and position of the body, under the supervision of the county attorney, the State Police or sheriff, or unless the Attorney General or the county attorney waives such requirements. After such photographs or such measurements and drawings have been made or have been waived and after the medical examiner has completed such examination as required of him in section 3027, the body may be removed to a convenient place. . . . ."

while in their own home, would indicate that a warrantless search of the premises is not made unreasonable or unconstitutional by the fact that the defendant exercises joint control over the premises."

See also *State v. Mincey*, 1977, 115 Ariz. 472, 566 P.2d 273, cert. granted October 17, 1977 (22 Cr.L. 4052).

*Brown v. State*, 1972, Tex.Cr.App., 475 S.W.2d 938, where the Texas Court said: "They [the officers] were admitted to the Brown home by the appellant and ascertained that homicides had been committed. Under these circumstances, it became the officers' duty to conduct a thorough investigation into the circumstances. Certainly this duty carried with it the right to inspect the premises."

*People v. Wallace*, 1973, 31 Cal.App.3d 865, 107 Cal.Rptr. 659, where the California Court advises: "Under these circumstances, both common sense and good investigative procedures dictated that the police retain possession of the premises and conduct a prompt and diligent investigation to ascertain the cause of the victim's death."

*People v. Neulist*, 1973, 43 A.D.2d 150, 350 N.Y.S.2d 178, where the New York Court, while recognizing as crucial elements supporting the propriety of the search 1) the posting of the guard, thereby establishing a continuing police presence on the scene, and 2) the relatively brief lapse of time between the removal of the body and the continuation of the investigation, further articulated its position in the following language: "Additionally, in dealing with a homicide the police should be accorded a greater leeway both in terms of the element of time and in the permissible scope of their investigation. In the context of this case, the police were not limited to an examination and search of the immediate area where the body was found (i. e., the bedroom). On the contrary, they had the right, indeed the duty, to examine the 'crime scene', which should be deemed to include the entire house."

The Oregon Court, on the other hand, in *State v. Brothers*, 1970, 4 Or.App. 253, 478 P.2d 442, ruled that the overruling of *Rabinowitz* in *Chimel* means that a search can no longer be justified on the sole basis of a finding that it was "reasonable," and that warrantless searches of homicide scenes under the authority of medical examiner statutes such as our 22 M.R.S.A., § 3025 statute are unconstitutional, unless special circumstances exist to bring such searches within the "exigent circumstances" rule dispensing with the necessity of obtaining a warrant. In *Brothers*, the defendant had accompanied the victim, his wife, to the hospital; the police had locked the apartment; the search was not initiated until some 2½ hours later; no attempt was made to secure a warrant; there was no evidence that an immediate search was necessary or that any evidence would have been lost if the police had taken the time to obtain a warrant.

Similarly, in *State v. Davidson*, 1969, 44 Wis.2d 177, 170 N.W.2d 755, a search of the homicide scene on a re-entry by the police without a warrant some three days following the original entry was said to be constitutionally tainted.

Again, in *People v. Williams*, 1976, Colo., 557 P.2d 399, the Colorado Court declined to adopt judicially for "on-scene searches following recent homicides" a special exception from the warrant requirement of the Fourth-Fourteenth Amendments. The same exception for exigent circumstances was said to apply in homicide cases as in other crimes.

If the *Chapman* rationale were applied in the instant case, then, no error could be ascribed to the Justice below in his ruling on the admissibility of Detective Greeley's testimony respecting the articles seized in the defendant's bedroom.

Whether the rule in *Chapman* respecting a warrantless search at the scene of a homicide has retained full vitality in the wake of the overruling of *Rabinowitz*, and, if it be still viable, what, if any, are its limitations as to space and time, we need not consider at this time.

Indeed, the defense in this case was predicated alternatively on pure accident or mental irresponsibility. The defendant admitted the shooting of his wife and the gun

and ammunition involved were not in controversy. Detective Greeley's testimonial description of the items seized in the bedroom, assuming the seizure was illegal, was of little significance in view of the issues raised, and, we believe, harmless beyond a reasonable doubt. *Chapman v. California,* 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *State v. Oakes,* supra; *Lonquest v. State,* supra; *Commonwealth v. Wegrzyniak,* 1971, 441 Pa. 249, 272 A.2d 167, 168.

### Evidence Rulings

#### 1

During the trial, the defendant presented Ernest Gibbons, one of his neighbors, to testify respecting his recollection of the events on the night of the crime. At bench conference, defendant's counsel sought an advance ruling from the Court, whether the State's attorney would be allowed to cross-examine witness Gibbons concerning the defendant's prior relationship with the deceased. Defense counsel suggested that the State be limited to the period of one month immediately preceding Mrs. Lewisohn's death. The presiding Justice rejected the suggestion, but ruled that the State would be restricted to the period of two months before the homicide, in which ruling the defendant's counsel affirmatively acquiesced. The State then was able to introduce testimony to the effect that the witness during that period of time had received calls for assistance from Mrs. Lewisohn, but, upon objections, the actual reasons for these calls were not disclosed to the jury.

It is now contended that this line of inquiry by the State left the jury with the impression that the defendant's prior relationship with his wife was unfriendly, such inferential evidence, it is claimed, being both irrelevant and prejudicial. In view of the defendant's initial consensual posture respecting the Court's ruling on the matter, we will now examine it, but only to determine whether the offending line of questioning constituted obvious error affecting the substantial rights of the defendant. Rule 52(b), M.R.Crim.P. Tested against this standard, it is clear that the State's

attempt to demonstrate the defendant's prior relationship with his wife does not entitle the defendant to a new trial.

■ The prior relationship between the accused and his victim, including their mutual temper and their feelings towards each other, was relevant to show motive and the absence of any mistake or accident. *Wakaksan v. United States,* 1966, 8 Cir., 367 F.2d 639, 645. See also *State v. Lavallee,* 1963, 104 N.H. 443, 189 A.2d 475, 479; *State v. Palmer,* 1890, 65 N.H. 216, 219, 20 A. 6, 7.

■ In a prosecution for uxoricide, evidence descriptive of incidents indicating trouble, animosity or hostility between husband and wife is competent, relevant and admissible. *Commonwealth v. Bonomi,* 1957, 335 Mass. 327, 140 N.E.2d 140, 153.

■ In the instant case, the Court's ruling purported to limit this type of evidence to a period of two months prior to the defendant's shooting of his wife. The question of remoteness as affecting admissibility is a matter within the sound discretion of the trial court. *State v. Beckwith,* 1962, 158 Me. 174, 180 A.2d 605.

■ Since the incidents showing prior relationship between the parties would have been admissible, the defendant was not prejudiced by the State's line of questioning which was not successful because of the defendant's objections to testimony relating to any specific event. The evidence that Mrs. Lewisohn had called Mr. Gibbons for assistance was admissible.

#### 2

The defendant next complains of the Court's ruling which thwarted his attempt to impeach Detective Greeley's testimony by using the trooper's investigation report in his examination of a defense witness. Detective Greeley had testified on cross examination by the defendant's counsel that shortly after the shooting of Mrs. Lewisohn he had interviewed one Richard Waterhouse, who lived in the neighborhood and that he had made a written report based on this interview. Presented with a copy of

his report, the detective stated that it was an accurate account of his interview with Waterhouse.

Later in the course of the trial Richard Waterhouse testified on direct examination by the defendant's counsel that on the night of the shooting, he had heard a loud bang followed by a male voice screaming: "Oh, my God, she's bleeding!" He further confirmed that he had been interviewed by Detective Greeley and stated that his statements to the officer were identical with his present testimony. Using the reference copy of the trooper's report, the defendant's counsel sought to examine the witness in relation to the contents of the officer's report. The presiding Justice, on objection by the State, did not permit counsel to conduct an examination of his own witness based upon the contents of the report.

Counsel for the defendant made clear to the Court what he intended to do by the following protest:

"I am not allowed to show that Detective Greeley made an erroneous or not complete report, your Honor?

\* \* \* \* \* \*

"I consider his report contrary to this testimony here [the testimony of Mr. Whitehouse]."

■ Initially, we note that Detective Greeley's report, although marked as an exhibit for the defendant, was not offered for admission in evidence and was not made a part of the record on appeal. Thus, we are unable to see for ourselves whether the report accurately reflects the substance of the related interview. This deficiency in the record removes any possibility of determining, whether the Court's restriction on counsel's conduct of his examination of witness Waterhouse was prejudicial to the defendant. Conjecture cannot substitute for the showing an appellant must make that the excluded testimonial or real evidence would have been favorable to him. See *State v. Warner*, 1967, Me., 237 A.2d 150, 167.

■ In any event, the issue of the alleged inaccuracy of Detective Greeley's report was of only collateral significance. This Court has repeatedly held that a witness cannot be cross-examined on collateral matters for the purpose of subsequently contradicting and impeaching his testimony in relation to such collateral matters. Detective Greeley's statement to the cross-examiner that his report was accurate introduced a collateral matter and the proffered evidence to show the contrary was inadmissible. See *State v. Bunker*, 1976, Me., 351 A.2d 841, 843; *State v. Biddison*, 1963, 159 Me. 475, 483, 195 A.2d 532, 536; *Bessey v. Herring*, 1922, 121 Me. 539, 118 A. 423; *State v. Benner*, 1874, 64 Me. 267, 287–288.

The defendant further contends that proof of Detective Greeley's inaccuracy in his investigation report did not involve a collateral matter but was relevant evidence, since "it was only through this impeachment of Detective Greeley that the jury could be made aware how much a police investigation concentrates on gathering evidence which will build a case for the State rather than on a balanced development of all of the facts."

■ Evidence having a legitimate tendency to shed light upon a fact in issue is relevant and admissible, unless its admissibility is precluded by some specific rule of exclusion. *State v. Fitzherbert*, 1969, Me., 249 A.2d 760; *State v. Eaton*, 1973, Me., 309 A.2d 334.

■ Evidence offered only to prove a merely collateral fact becomes relevant and admissible, if it tends to either add probability or improbability to material facts in the case. *State v. Taylor*, 1975, Me., 343 A.2d 11, at 17.

■ Relevant evidence is that which relates logically to a fact or issue at hand and the determination whether evidence is relevant is within the discretionary power of the trial Justice whose decision will not be overturned absent an abuse of discretion. *State v. Northup*, 1974, Me., 318 A.2d 489.

Under 25 M.R.S.A., § 1502, members of the State Police are vested with the same powers and duties throughout the several counties of the State as sheriffs have in

their respective counties "to investigate and prosecute violators of any law of this State and to arrest the offenders thereof," and the "State Police, sheriffs and deputy sheriffs, constables, city marshalls, deputy marshalls and police officers of cities and towns shall, so far as possible, cooperate in the detection of crime, the arrest and prosecution of criminals and the preservation of law and order throughout the State."

■ As stated in *Sawyer v. County Commissioners*, 1917, 116 Me. 408, 102 A. 226, the sheriff is a constitutional officer vested by the common law and the statute law with the duty to conserve the peace and protect society against the commission of vice and crime.

■ Hence, the duty to investigate the commission of crime with which law enforcement officers are charged carries with it the use by the officers of legitimate effective police investigative techniques designed to ferret out facts respecting criminal behavior justifying the arrest and prosecution of persons suspected of having committed a crime. The character of the police investigation, even if geared to build the State's case, has no logical relation to, nor probative value to support or disprove, the issue at hand, whether the defendant was guilty of unlawful homicide punishable as murder. Such smoke-screen defense tactic would have materially beclouded the issue in the case and for that reason was properly excluded from the evidence. See *State v. Bassett*, 1964, 151 Conn. 547, 200 A.2d 473, where the alleged selective enforcement of the Sunday closing laws was ruled of such slight and inconsequential relevance to the issue of guilt or innocence of the crime of blackmail as to justify its exclusion to prevent jury distraction from the main issue.

3

■ The defendant sought to impeach the credibility of his two minor daughters, 14 and 10 years of age respectively, through the use of a psychologist who had listened to their testimony at the trial. The proffered opinion of this expert witness would have been to the effect that children of that age will screen out facts in conflict with their wishful thinking with resulting adjustment of their initial perception as well as their later remembrance of the events. The presiding Justice excluded such evidence on the ground it would be a very serious invasion of the province of the jury. We agree.

The question at issue is, whether the credibility of a witness whose competency as such is not disputed may be impeached by expert evidence that persons subjected to occurrences of a frightening nature, and especially children in their minority, are incapable of accurately perceiving, recalling and relating the events as they happened, but will distort the same due to the excitement and fear surrounding the occasion. It must be noted that, in addition to the concession of competency, no evidence was introduced in the instant case to the effect that the defendant's daughters suffered from any emotional disturbance or were afflicted with any psychological "problem" as a result of their presence at the scene of the homicide.

Neither the veracity nor the credit of a witness is necessarily impeached by proving that, by reason of the frightening nature of the circumstances surrounding an observed event, the witness' mental capacity to observe and retain with accuracy the details of the happenings is weakened. The expert witness may be in no better position than the jurors to evaluate the credibility of such a witness.

■ Absent a "medical" condition affecting the ability of the witness to tell the truth, evidence may not be received to discredit the testimony of a witness in the nature of an expert's opinion that the events were such as to have so affected the mental capacity of such witness that his ability to make an accurate observation of the facts and to retain a true recollection thereof has been impaired and that his assertions respecting the details of the occurrence will necessarily or most probably be a distortion. Any other rule might lead to as many collateral issues as there are witness-

es, and would only serve to divert the minds of the jurors from the true issues in the case. Such testimony would in effect take over the jury's task of determining the weight and credibility of the witness' testimony. See *Bell v. Rinner,* 1864, 16 Ohio St. 46; *Abbott v. State,* 1925, 113 Neb. 517, 204 N.W. 74; *People v. Johnson,* 1974, 38 Cal. App.3d 1, 112 Cal.Rptr. 834.

■■■ We agree that a witness' capacity to perceive, recollect and communicate may be impeached in certain circumstances, as where the witness is afflicted with a disability affecting the mental or physical processes, such as mental disease, blindness, deafness, or the like. The cases cited by the defendant to support his position all dealt with the impeachment of witnesses who were suffering from mental disease or defect and are not apposite.

## Jury Instructions

### 1

The defendant's first claim of error in jury instructions involves the presiding Justice's "reading [to the jury] the statutory definition of manslaughter, which included a definition of voluntary manslaughter when the Court read it."

Prior to the charge, the State's attorney and the defendant's counsel informed the presiding Justice of their shared belief that an instruction to the jury on the elements of voluntary manslaughter would not be appropriate, as the case did not present any evidence that the defendant shot his wife in the heat of passion and on sudden provocation. The presiding Justice agreed that he would not instruct the jury on that offense.

During his charge, however, the presiding Justice, after reading to the jury the statutory definition of murder, purported to read to them the statutory definition of manslaughter:

"I will read you the definition of manslaughter: Whoever unlawfully kills a human being in the heat of passion or [sic] on sudden provocation without express or implied malice or [sic] aforethought is guilty of manslaughter and shall be punished."

In so doing, however, the Justice below left out of the statutory definition as given to the jury—

"Whoever commits manslaughter as defined by the common law, shall be punished . . .." 17 M.R.S.A., § 2551. He then explained fully the elements of the crime of unlawful homicide punishable as murder. The defendant raises no objections regarding the instructions in relation to the crime of murder.

Prior to addressing the jury on manslaughter, and by way of transition from the topic of murder to that of manslaughter, the presiding Justice made the following remark:

"Supposing you apply those principles of law to the facts as you find them, conclude that this defendant is not guilty of murder, you must then address yourselves to the question of whether or not you are convinced beyond a reasonable doubt that he is guilty not of murder but of manslaughter. And, so, now having read you the statute that defines manslaughter, I will read . . . will try to explain to you what that means."

The defendant maintains that the reference remark, coupled with the previous reading of the incomplete statutory definition of manslaughter, constituted reversible error, even though the Court's subsequent instructions contained no suggestion that the crime of manslaughter as he was then explaining required as an element thereof that it be committed "in the heat of passion and on sudden provocation," nor did his instructions carry even a scintilla of reference thereto, but were proper and complete in themselves to inform the jury of the necessary ingredients of the crime of involuntary manslaughter. The defendant argues that the presiding Justice's charge taken as a whole precluded the jury from returning a verdict of manslaughter, since the evidence did not suggest a reasonable possibility that the defendant shot his wife in the heat of passion and on sudden provocation. We disagree.

Initially, we are confronted with the question, whether the defendant adequately preserved this claim of error for appellate review. Rule 30(b) of the Maine Rules of Criminal Procedure provides that a party may not complain of an error in jury instructions

> "unless he objects thereto before the jury retires to consider its verdict, stating *distinctly* the matter to which he objects and *the grounds of his objection.*" (Emphasis added)

In *State v. Boisvert*, 1967, 236 A.2d 419, 422, the requirement of Rule 30(b) that a party state *distinctly* the grounds of his objection, the Court said, is not a mere formality. The object of the rule the Court continued, is

> "[T]o insure that the jury is correctly informed as to the applicable law . . .. The rule places responsibility for this upon counsel as well as the Court to the extent that counsel who believes an erroneous instruction to have been given must not only state his objection distinctly . . . but he must also make clear to the Court his reason for believing the Court's language to be erroneous. The purpose for the rule is not simply to preserve the defendant's right to a *new* trial in case of erroneous instruction but also to make possible a correction in the judge's charge so that the jury may be properly instructed at *this* trial." (Emphasis in original)

■ True, the defendant's failure either to state the grounds for his objections to the charge or to provide sufficient particulars thereof, notwithstanding non-compliance with Rule 30(b), M.R.Crim.P., will not preclude appellate review of the claimed error, if the defendant has done all that could reasonably be expected to make the court aware of the essence of his objection and the court did or should have understood it. See *Golden v. United States*, 1963, 1 Cir., 318 F.2d 357, 360; *United States v. Currens*, 1961, 3 Cir., 290 F.2d 751, 759, 760.

In the instant case, it is clear from the record the presiding Justice was aware that a voluntary manslaughter instruction did not have any support in the evidence. Thus, the defendant's general objection merely to the reading of the statutory definition of voluntary manslaughter was sufficient for our consideration of the issue, whether the disclosure to the jury of what constitutes voluntary manslaughter under the statute is reversible error per se, where the evidence in the case will not support a verdict to that effect as a matter of law.

■ In a prosecution for unlawful homicide punishable as murder, the trial justice should not instruct the jury on the elements of voluntary manslaughter, when such an instruction is unwarranted on the facts of the case. See *State v. Stackpole*, 1975, Me., 349 A.2d 185, 191; *State v. Hilliker*, 1974, Me., 327 A.2d 860, 866, 867; *State v. Park*, 1963, 159 Me. 328, 193 A.2d 1.

■ The mere reading of the statutory definition of voluntary manslaughter, where unwarranted on the evidence, must be disregarded, however, as not affecting any substantial rights of the defendant. *State v. Stackpole*, Id. at 192; M.R.Crim.P. 52(a).

To the same effect, see *Linder v. State*, 1974, 132 Ga.App. 624, 208 S.E.2d 630; *State v. Jones*, 1974, 23 N.C.App. 162, 208 S.E.2d 419; *State v. Forcella*, 1961, 35 N.J. 168, 171 A.2d 649; *State v. Thompson*, 1936, 338 Mo. 897, 92 S.W.2d 892.

■ The record is clear that the defendant's objection was directed solely to the fact the Justice had read to the jury the statutory definition of voluntary manslaughter. If the defendant had any idea that in the context of the whole charge the jury might reach back into the definition of voluntary manslaughter as given by the Justice at the beginning of his instructions and could possibly perceive the ingredients of heat of passion and sudden provocation as carrying over by implication into the Justice's obvious instructions on involuntary manslaughter, it was his duty as mandated by Rule 30(b), M.R.Crim.P., to distinctly articulate the real reason underlying his objection. Affirmative action on his part by way of a request that the jurors be

instructed they did not have to find that the defendant shot his wife in the heat of passion on sudden provocation in order to convict of manslaughter would have apprised the Justice of the exact nature of the objection and undoubtedly the request would have been granted and the alleged error cured prior to jury deliberations. The non-compliance with Rule 30(b), M.R. Crim.P., in this respect requires that we review the matter solely on the basis of obvious error affecting the substantial rights of the defendant. *State v. Boisvert,* supra; Rule 52(b), M.R.Crim.P.

After giving to the jury proper instructions respecting the elements of the crime of murder, the presiding Justice then remarked that he had read them the statute defining manslaughter and would now explain what manslaughter means. Without any reference whatsoever to heat of passion and sudden provocation, he charged the jurors in the unmistakable terms of involuntary manslaughter.

"Manslaughter consists of what we call blameworthy culpable acts which result in someone else's death not as murder. Gross negligence will justify a manslaughter conviction if it involves a reckless disregard for the lives and safety of others. It is of a much higher degree of negligence than is required to prove _ _ required to be proven of a civil case.

"I have already said to you if you are careless and your carelessness injured somebody, you may have to pay damages for it but you are not criminally involved; but when that degree of carelessness is elicited to a point where it is gross carelessness, acts ignoring and disregarding the possibility of serious bodily injury or death to someone else, that goes over the civil definition of negligence into the criminal definition of negligence; actions which appear to have been taken without regard to the lives and safety of others.

"Those are the laws that apply in this case. Murder is actually specific intent to do away with somebody else and carrying out that intent, planned and deliberated; or actions which I have said are so reckless and brutal with such a high po-

tential that death results. That, also with the facts, is murder.

"Manslaughter is less than that. In one sense, it is a matter of degree. How do you find the conduct of the defendant to be on the night in question. The State produced no eyewitnesses to the event because the only eyewitness to the event is the defendant himself. You heard his testimony. It is up to you to evaluate it. If you accept his version of what happened, you must then decide whether he is guilty, or whether it is pure accident or whether his conduct, as he described it, made him guilty of any criminal offense as I have defined those criminal offenses to you.

"The State's position is, as I understand it, and I'm not commenting on the evidence, that the circumstantial evidence points either to murder or manslaughter. They suggest murder and make the story of the defendant _ _ _ his testimony, not the story, strike that _ _ _ makes the testimony of the defendant unbelievable. The defense takes the position not only in accord with the testimony of the defendant but all the other circumstantial evidence in the case, that there is no evidence of criminality and what happened was accidental.

"To give you some assistance, I asked Counsel if they would object to me giving you a set of illustrations which might be helpful and they said no, they do not object. You must remember, these are only illustrations, perhaps, to help you in the sense of some guidelines, differentiate between accident on the one hand and intentional murder on the other and what lies in between.

"I will start with an accident. If you visualize a law abiding citizen walking through the woods on a Saturday afternoon hunting deer with a rifle. The rifle is on safety. He steps in a hole and falls down and the gun, regardless of being on safety, goes off. A bullet ricochets against a rock, shoots off in an angle, there being no one to his knowledge in front of him, and it hits and kills another

person, unbeknownst to him, hunting in the woods. I think any reasonable person would conclude that was purely accidental and would involve no criminality.

"Visualize another person hunting in the woods for a deer. Perhaps, a little bit foggy. He sees something brown. It's moving. He studies it. He concludes, perhaps, that it is a deer and he shoots. A Jury would be warranted in finding under those circumstances he was guilty under civil negligence. He should pay damages but not conduct which approaches the borderline of criminality.

"Take another person who is hunting a deer. A perfectly bright day. He sees something brown. Bang! The Jury would be warranted in finding that to be gross negligence and a criminal act. Using that gun without regard, by doing what he did, to the lives and safety of others.

"Now, supposing that you visualize another man sitting on the side of a hill with a rifle _ _ _ a loaded rifle in his hand and a passenger train, although we don't have any left, going by and he just shoots abandonly right at them. He doesn't have any specific intent to kill anybody but certainly that would be a reckless, brutal act with a high potential of loss of life. That would be an illustration of murder implied. Malice aforethought not express but implied, see, that would be a highly reckless action quite likely to result in death even though he has no specific intent to kill and, finally, the man, as I said before, sits down, picks up some reason in his mind to intentionally kill another human being, secures a gun, loads it, waits in ambush and shoots him deliberately; that would, of course, be malice aforethought expressed."

■ In view of the clear instructions on involuntary manslaughter coupled with the factual concrete examples given the jury for application of the law, it is our belief that the jurors were in no way confused by the earlier reference definition of voluntary manslaughter. The propriety of a charge will be determined by a review of the entire body of instructions and not by consideration of only isolated fragments thereof. See *State v. Bey,* 1975, Me., 342 A.2d 292, 295. Under the circumstances, we find that the substantial rights of the defendant were afforded him and that no reversible error was committed.

2

■ The defendant next contends that the presiding Justice failed to articulate with sufficient clarity the distinction between the elements of murder and those of involuntary manslaughter.

The offending instructions may be summarized as follows:

1) It is also murder if a person intends to do an act so recklessly and brutal or exhibited by conduct which when objectively evaluated is characterized by a high death producing potential and death results. By conduct when objectively evaluated is characterized by a high death producing potential, I mean conduct when comprehended and evaluated by a person of ordinary intelligence and average competency demonstrates maliciousness. Manslaughter is less than that. In one sense, it is a matter of degree.

2) Manslaughter consists of what we call blameworthy culpable acts which result in someone else's death, *not as murder.* Gross negligence will justify a manslaughter conviction if it involves a reckless disregard for the lives and safety of others.

This instructional distinction, coupled with the applicable examples of varied specific conduct given the jury, absent a requested instruction proffering a more elaborate explanation, satisfied the concept, that reckless conduct which, when viewed objectively would be considered in law to have the equivalent effect of a subjective intention to kill, although neither involving necessarily such a subjective intention to kill nor a subjective awareness of the serious danger to which others are exposed, had to be conduct which demonstrated *such a serious disregard* of the obligation to exer-

cise reasonable care not to unreasonably endanger the lives and safety of others that it would be tantamount to a subjective intention to kill deserving of punishment as for murder. *State v. Ellis,* 1974, Me., 325 A.2d 772, at 776, n. 2.

Thus, we do not believe the jurors were misled to assume that a mere finding of gross negligence could support a murder conviction.

### 3

■ The defendant objected to that portion of the charge which ran as follows:

"You heard his [the defendant's] testimony. It is up to you to evaluate it. If you accept his version of what happened, you must then decide whether he is guilty or whether it is pure accident, or whether his conduct, as he described it, made him guilty of any criminal offense as I have defined those criminal offenses to you."

The defendant argues that the jury could not have justifiably based a conviction of murder or manslaughter upon his version of the homicide. We disagree. The defendant's contention gives too narrow an interpretation to the Justice's language. Viewed more broadly, this statement left to jury determination the evaluation of the defendant's conduct in respect of the nature of the recklessness involved, which was proper in the circumstances.

### Omissions in the Charge

### 1

■ Prior to the charge, the defendant requested the presiding Justice to instruct the jurors that the State had the burden of proving beyond a reasonable doubt that the shooting of the deceased was not accidental. He now contends on appeal that the trial Justice's failure to give such requested instruction may have led the jury to believe that the defendant had the burden of proving an accidental homicide.

We note initially that the defendant failed to preserve this claim of error at the trial level. Indeed, at the end of the charge, the defendant's counsel put the trial

Justice on notice that he had failed to inform the jury in terms of the reference requested instruction. When the trial Justice replied that he had covered the substance of the requested instruction in his charge, the defendant's counsel stated "Okay" and proceeded to take up other matters. We view the failure of defense counsel to press his objection at that point as fatal to normal appellate review.

■ Viewed in the context of obvious error affecting substantial rights of the accused, we must say that the alleged omission in the charge did not constitute manifest error within the scope of Rule 52(b), M.R.Crim.P. Although the presiding Justice never gave the defendant's requested instruction in its specific terms, he did tell the jury that the State had to establish the defendant's guilt beyond a reasonable doubt and that this burden never shifted to the defendant. Furthermore, after commenting at one point upon the defendant's position that the shooting of his wife was accidental, the presiding Justice then informed the jurors that they should resolve every reasonable doubt in favor of the defendant. We believe these instructions effectively indicated to the jury that the State had the burden of proving beyond a reasonable doubt that the homicide was not accidental.

### 2

At trial, several witnesses testified that the defendant had consumed large quantities of alcoholic beverages on the night of the homicide. In his instructions to the jury the presiding Justice stated that they should consider this evidence of the defendant's intoxication in the following manner:

"And, finally, there has been evidence in this case that the defendant had consumed on the night in question some alcoholic beverage. I think that he admitted himself on the stand that he had consumed some. The amount that he consumed would be, of course, up to the jury to determine if it was relevant, but the law is that voluntary intoxication is no excuse for the commission of a crime. The fact that a person drinks does not

excuse him from something that he did which otherwise would constitute a crime."

The defendant's counsel requested the presiding Justice to qualify this instruction by informing the jurors that they could consider evidence of the defendant's intoxication in determining, whether the defendant knew that the gun with which he shot his wife was loaded. The presiding Justice rejected this request, stating that defense counsel could argue the point before the jury, but that it would not be appropriate as an instruction. The defendant presently contends that the trial Justice's refusal to give the requested instruction entitles him to a new trial.

■ It is a well-settled rule of law that voluntary intoxication will not relieve a criminal defendant of responsibility for criminal acts, except in those cases where knowledge or specific intent are necessary elements of the crime charged. *State v. Arsenault*, 1956, 152 Me. 121, 126, 124 A.2d 741, 743; *State v. Siddall*, 1926, 125 Me. 463, 464, 134 A. 691.

And, in such cases, voluntary intoxication is a defense only if the defendant's condition has reached such a degree of complete drunkenness that he is on account of it incapable of forming the requisite intent or of possessing the necessary knowledge essential to the commission of the crime charged. *State v. Smith*, 1971, Me., 277 A.2d 481, 492.

■ In the instant case, the State did not have to prove that the defendant had a subjective awareness of the danger to which he was exposing his wife in order to convict him of murder. The State could have sustained its burden by demonstrating that the homicide resulted from conduct embodying an "objectively high death-producing potential." See *State v. Ellis*, 1974, Me., 325 A.2d 772, 776, n. 2; *State v. Lafferty*, 1973, Me., 309 A.2d 647, 672, n. 5.

Furthermore, the evidence falls far short of showing that the defendant's state of inebriety was such as to destroy his mental capacity of possessing knowledge of the loaded or unloaded condition of the gun. See *State v. Mosley*, 1934, 133 Me. 168, 172, 175 A. 307; *State v. Hurd*, 1972, Me., 288 A.2d 478, 483.

Thus, the defendant was not entitled to the requested instruction as knowledge that the weapon was loaded was not an essential element of the offense charged against him.

3

■ The defendant also claims reversible error in the Court's refusal to give the jury the so-called "negative-exclusion" rule, which provides that a conviction cannot be based on circumstantial evidence, unless the proven circumstances are sufficient to exclude every other reasonable hypothesis except that of guilt.

For many years, this Court required that this type of instruction be given to juries in order to clarify the meaning of proof beyond a reasonable doubt. See, e. g., *State v. Liberty*, 1971, 280 A.2d 805, 807; *State v. Allen*, 1956, 151 Me. 486, 489, 121 A.2d 342, 345; *State v. Cloutier*, 1936, 134 Me. 269, 280, 186 A. 604, 610.

This Court, however, has recently overruled the above line of cases, reasoning that the negative-exclusion rule creates an erroneous distinction between direct and circumstantial evidence and tends to confuse the jury. See *State v. Little*, 1975, 343 A.2d 180, 185; *State v. Heald*, 1975, 333 A.2d 696, 700; *State v. Pike*, 1973, 306 A.2d 145, 149–150; *State v. Tomer*, 1973, 304 A.2d 80, 85 n. 6. In fact, we have intimated that such an instruction may cause, rather than avoid, prejudicial error. See *State v. Pike*, supra; *State v. Tomer*, supra. The presiding Justice was justified in refusing to give this instruction to the jury.

### Sufficiency of the Evidence

The defendant contends that the record contains insufficient evidence to support his conviction of the offense of unlawful homicide punishable as murder. He properly preserved this argument for appeal by moving for a judgment of acquittal at the close of the evidence.

 In reviewing the sufficiency of the evidence to support a verdict, we must recognize that the jury has the responsibility to determine the credibility of the witnesses and the weight to be given their testimony. See *State v. Blier,* 1974, Me., 330 A.2d 122, 123; *State v. Trask,* 1966, Me., 223 A.2d 823, 824.

The role of the appellate court in such instances is limited to determining whether, in view of all the evidence, the jury was warranted in finding the defendant guilty beyond a reasonable doubt. *State v. Mann,* 1976, Me., 361 A.2d 897, 906; *State v. Goldman,* 1971, Me., 281 A.2d 8, 12.

 During the first stage of his bifurcated trial, the defendant based his defense on accidental homicide. He testified that, shortly before the shooting of his wife, he had decided to clean his 9 mm. handgun. He stated that he removed the weapon, which he thought was unloaded, from a bureau in his bedroom and walked into the kitchen where his wife was washing dishes, intending, so he said, to clean the gun while he engaged in conversation with his wife, thinking all the while the clip in the gun to be empty. As he sat down at the kitchen table and began to clean the weapon, the handgun accidentally discharged the fatal bullet, so he claimed. Horrified at the sight of his wounded wife, the defendant testified that he shot himself in an attempt to take his own life. He then directed one of his children to get an ambulance.

After reviewing the record, we believe the jury could have justifiably rejected as incredible the defendant's contention that he was cleaning his gun at the time of the homicide. To say the least, it would appear unlikely that anyone would suddenly decide to clean a firearm at the late hour of 2:00 a. m., shortly after the guests one was entertaining had made their departure. In addition, the record reveals that the defendant's unopened gun cleaning kit was found resting on a book shelf in the dining room, and not, as the defendant's testimony, would indicate, in the kitchen.

The jury could also have justifiably considered the defendant's response to the shooting of his wife as tending to contradict the possibility of accidental homicide. They could have concluded that a person would react to the accidental shooting of his wife by immediately seeking medical attention for her injuries. In the case at hand, the defendant responded to the sight of his wounded wife by shooting himself; he did not direct his daughter to seek help until after the suicide attempt.

Further indication of the defendant's guilt may be supplied by examining the statements made by the defendant immediately after the shooting. When asked by his daughter why he had shot her mother, the defendant replied either that he did it "without love or compassion" or "[b]ecause you didn't give me love and compassion." Upon the arrival of the police, the defendant begged the officers to shoot him and "finish the job that he had started." He also stated that "she didn't want to live anymore. Can you believe that?" The jury could have considered these statements as inconsistent with an accidental shooting.

Finally, the State presented an expert witness to testify on the safety features of the homicide weapon. The witness stated that the weapon with which the defendant shot his wife did not have a hair trigger and would not fire unless the trigger was pulled.

In view of the above evidence, we do believe that the jury could have justifiably determined beyond a reasonable doubt either that the defendant intended to kill his wife or that his wife's death resulted from the defendant's handling of a deadly weapon with such rash recklessness as to manifest in him a serious, if not complete, disregard of his obligation to exercise reasonable care so as not to unreasonably endanger the life of his wife. We accordingly hold that the record contains sufficient evidence to support a conviction of murder.

*Second stage of trial-criminal responsibility*

1

In the second portion of his bifurcated trial, the defendant attempted to demon-

strate that the shooting of his wife was as a result of mental disease or defect. He presented the testimony of a psychologist and a psychiatrist who had examined him to ascertain his mental condition shortly after the commission of the homicide. The two expert witnesses diagnosed the defendant as having a paranoid personality of severe proportions, and discussed the manner in which this condition would affect his behavior.

At the close of the defendant's case, the State, in an attempt to rebut the conclusions of the defendant's expert witnesses, offered the testimony of one psychologist and two psychiatrists who had also examined the defendant subsequent to the date of the crime. The defendant objected to the admission of the State's expert witnesses on the ground that their testimony would violate the psychologist-patient and psychiatrist-patient privileges expressed in 32 M.R.S.A. § 3815 and 16 M.R.S.A. § 60 respectively. The presiding Justice overruled the defendant's objection and allowed the State's expert witnesses to testify.

At common law, the so-called physician-patient privilege which prohibits the disclosure of communications between persons in such relationship did not exist. *Rancourt v. Waterville Urban Renewal Authority,* 1966, Me., 223 A.2d 303. The same would be true respecting any such privilege where the other person was a psychologist or psychiatrist instead of a physician. The psychologist-patient and psychiatrist-patient privileges both are statutory.[3]

The reason motivating the Legislature to establish either the psychologist-patient privilege or the psychiatrist-patient privilege obviously was to create an atmosphere of confidence between the parties and to encourage patients to communicate freely with these people for the purpose of securing a proper diagnosis of their condition.

Such public policy would be so promoted with the legal assurance that any information the patients did pass on which might result in humiliation, embarrassment or disgrace to them may not be disclosed, but will remain confidential.

On the other hand, the public interest in ascertaining the true condition of persons accused of crime who seek to avoid legal responsibility for their criminal activity by reason of their mental deficiencies is very strong. If a defendant is permitted to escape punishment for his criminal acts on the basis of expert testimony tending to establish that his behavior was the product of mental disease or defect, and the State may not introduce impeaching testimony of other experts who have examined him, on the ground that the privilege prevents the disclosure of such evidence, then the cause of justice would be brought into extreme ridicule.

■ The privilege, on the face of the statute, is made personal to the patient *who must claim it;* such conditional provision indicates by necessary implication that the privilege may be waived.

■ Furthermore, where, as here, the patient at his trial, first fully discloses the evidence of his affliction which he could have kept secret by the exercise of the privilege, it is only reasonable to believe that the Legislature viewed such revealment by the patient as tantamount to an implied waiver of the privilege within the intendment of the legislation. Once the evidence of his mental condition has been fully aired at the instigation of the patient-defendant, there is no need to protect further disclosures by other psychologist or psychiatrist witnesses called by the State. Any other rule would simply be an unreasonable and unnecessary obstruction to public justice. See *People v. Edney,* 1976, 39

---

3. 32 M.R.S.A., § 3815 (P.L.1968, c. 544, § 82) provides:

"A person has a privilege to refuse to disclose, and to prevent a witness from disclosing, a communication between himself and a psychologist or psychological examiner if he claims the privilege."

16 M.R.S.A., § 60 (P.L.1973, c. 481) reads:

"A person has a privilege to refuse to disclose, and prevent a witness from disclosing, a communication between himself and a board certified psychiatrist, if he claims the privilege."

N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400; *People v. Abdul Karim Al-Kanani,* 1973, 33 N.Y.2d 260, 351 N.Y.S.2d 969, 307 N.E.2d 43; *State v. Tradewell,* 1973, 9 Wash.App. 821, 515 P.2d 172; *People v. Givans,* 1967, 83 Ill.App.2d 423, 228 N.E.2d 123; *State v. Swinburne,* 1959, Mo., 324 S.W.2d 746; *State v. Sapp,* 1947, 356 Mo. 705, 203 S.W.2d 425. Contra: *People v. Plummer,* 1972, 37 Mich.App. 657, 195 N.W.2d 328.

In somewhat analogous situation, this Court has held that the presentation of the issue of inadequate representation of counsel constitutes a waiver of the attorney-client privilege and permits testimony by the attorney relevant to the issue including the disclosure of conversations between him and his former client which would otherwise be privileged. *Northup v. State,* 1971, Me., 272 A.2d 747, 751.

**2**

■ The defendant's final contention is that the presiding Justice erred in his instructions to the jury on the insanity defense. At the time of the defendant's trial, the rule in Maine regarding the insanity defense was dictated by 15 M.R.S.A. § 102, which provided that "[a]n accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. . . ."

In explaining this statute, the presiding Justice instructed the jury as follows:

"Our Court has interpreted the phrase used in that statute 'mental disease or defect' to mean that if the Jury is satisfied by a fair preponderance of the evidence that but for a mental disease or mental defect, which substantially effected [sic] his mental or emotional processes and which substantially impaired his behavior controls, the accused would not have committed the acts complained of, then he is not criminally responsible.

\* \* \* \* \* \*

"The term 'mental disease' differs from 'mental defect' in that mental disease is a condition which is either capable of improving or deteriorating while a mental defect is a condition not capable of improving or deteriorating."

The defendant contends that the presiding Justice erred in refusing to give in full the following instruction:

"A mental disease or mental defect is *any abnormal condition of the mind* which substantially affects mental or emotional processes and substantially impairs a person's ability to control his behavior." (Emphasis supplied)

The refusal so to instruct was not error. The term "abnormal" as defined by the lexicographers, when applied to any particular thing or condition, means that it deviates from the normal, does not correspond to the regular type, but is markedly or strangely irregular. When conjoined with "mental condition", the word connotes a mental condition less than or inferior to the normal, indicates a deficiency in intellectual powers and is characterized by mental defect or disorder. Abnormality may be said of any departure from the accepted standards of social behavior. See Webster's Third New International Dictionary. The phrase "abnormal mental condition" must not be viewed as composed of words of art and cannot be considered as the equivalent of mental disease or defect, since it may comprise many conditions that do not constitute either a mental illness or a mental defect. See *O'Beirne v. Overholser,* 1961, D.C.D.C., 193 F.Supp. 652, 655. That mental abnormality may characterize the condition of a patient who is afflicted with mental disease or defect does not mean that any and all mental abnormalities, notwithstanding some substantial impact on a person's mental or emotional processes and behavioral controls, do necessarily rise to the level of mental disease or defect.

The instructions given to the jury by the presiding Justice on this issue were remarkably clear, complete and accurate. See *State v. Durgin,* 1973, Me., 311 A.2d 266.

The entry will be

Appeal denied.

WEATHERBEE, J., sat at argument and participated in consultation, but died prior to the preparation of the opinion.

DUFRESNE, C. J., and ARCHIBALD and DELAHANTY, JJ., concurring.

POMEROY, J., with whom WERNICK, J. joins, dissenting.

POMEROY, Justice, with whom WERNICK, Justice joins, dissenting.

I agree neither with the result announced by the majority nor the rationale by which it was reached.

I respectfully dissent.

My reasons for dissenting are as follows:

"In the trial of an action it is the duty of the presiding justice, at the close of the evidence, to present the case, in his charge to the jury, by pointing out clearly and concisely the precise issues in controversy and the rules of law applicable thereto . . . 'He should do all such things as in his judgment will enable the jury to acquire a clear understanding of the law and the evidence to form a correct judgment. He is to see that no injustice is done.' "

*Desmond v. Wilson*, 143 Me. 262, 267, 60 A.2d 782, 785 (1948), quoting from *York v. Railroad Co.*, 84 Me. 117, 24 A. 790 (1891); *Wing v. Morse*, Me., 300 A.2d 491, 502 (1973).

We are here confronted with a claim that the presiding justice in this criminal case failed to point out "clearly and concisely the precise issues in controversy and the rules of law applicable thereto" in that he misled the jury as to the requisite elements of "manslaughter" as a possible jury verdict. Thus, says appellant, the presiding justice has not seen to it "that no injustice is done."

The opinion of the majority concludes that counsel for the defendant had not adequately saved this alleged error at the trial level, and it can be reviewed "solely on the basis of obvious error affecting the substantial rights of the defendant".

I strongly disagree.

In my opinion the alleged error is properly before us and it was adequately preserved as required by Rule 30(b) of the Maine Rules of Criminal Procedure.

Generally when an objection is made to an instruction given by the court to the jury, the objection is raised either because the instruction is allegedly a misstatement of the applicable law or because the party does not believe it appropriate to instruct the jury on that legal point. In the case at bar, appellant's objection was stated as follows:

"We object to the Court reading the statutory definition of manslaughter, which included a definition of voluntary manslaughter when the Court read it."

For a full understanding of appellant's complaint, the objection must be analyzed in the context of the circumstances.

Both the state and the appellant agreed that voluntary manslaughter was not an issue as there was no evidence to support a conclusion that the killing occurred in the heat of passion upon sudden and adequate provocation. Only moments before the objection in question was made, the court at side bar clearly indicated its awareness that neither side regarded voluntary manslaughter as an issue in the case.

Given this setting, it must have been clear to the trial justice that the reason for the objection was that he had read from the statute relating to voluntary manslaughter and had referred back to what he had earlier read immediately before he proceeded to say, "I will try to explain to you what that means." By this objection, the trial justice was made aware that the appellant objected to the instruction because it was likely that the jury would be confused into believing that heat of passion upon sudden and adequate provocation was a necessary element of involuntary manslaughter.

The purpose of Rule 30(b) is to alert the court to alleged errors and provide it with an opportunity to correct errors, if any, during the trial. *State v. Boisvert*, Me., 236 A.2d 419 (1967). Realizing that the court was aware that voluntary manslaughter was not an issue, this objection was sufficient to alert the court to the alleged error. The purpose behind Rule 30(b) has been met. In my view the claim of error was properly saved.

During the early morning hours of June 3, 1974, Roslyn Lewisohn received a fatal gunshot wound and the appellant received a gunshot wound. The previous evening, June 2, Mr. Lewisohn and the late Mrs. Lewisohn entertained guests in their home. After the departure of the guests, the appellant hitchhiked to a Portland restaurant and cocktail lounge. While he was there, he met several of his acquaintances whom he subsequently invited to his Cape Elizabeth home. This second group of guests remained at the Lewisohn home until approximately 2:00 a.m. on the morning of June 3.

After the departure of these visitors, various members of the household were awakened by loud requests from the appellant to assist him, in particular with the dishes. Mrs. Lewisohn, the testimony indicates, was the first to respond. Before either of the appellant's daughters appeared, they heard a loud bang, apparently a gunshot, and breaking glass.

The younger of the two girls was the first to arrive in the kitchen.

There she observed her dying mother lying on the kitchen floor, bleeding profusely.

In the room with the dying mother was the distraught appellant, armed with a gun.

Before the older daughter reached the kitchen, the appellant shot himself.

The appellant was the only eyewitness to the acts resulting in Roslyn Lewisohn's death.

The state bottomed its prosecution for unlawful homicide punishable as murder on the theory that appellant intentionally shot his wife and then attempted to commit suicide.

Lewisohn, testifying on his own behalf, posed a claim that the death of his wife resulted from accident. His testimony before the jury was to the effect that while he was sitting in the kitchen talking with his wife, he was in the process of cleaning what he assumed was his unloaded gun. The deceased at that time was doing the dishes. As he was cleaning it, the gun unexpectedly and accidently fired, and the bullet struck Mrs. Lewisohn.

He says he was overwhelmed by the tragedy of the occurrence.

For this reason, he shot himself in an unsuccessful suicide attempt.

The testimony at the trial referred to only two bullets having been fired. The evidence indicates that one bullet struck Mrs. Lewisohn, apparently exited through the kitchen window, and was never recovered. It was this bullet which the appellant stipulated caused her death. One bullet was discovered in a kitchen closet. It was this bullet which apparently caused appellant's self-inflicted wound.

In that posture, if the jury was persuaded beyond a reasonable doubt that the state's theory was correct, the verdict returned, i. e., "murder", was legally justified.

When one kills a human being with the intention that death result from such action (in the absence of justification or excuse), such killing spells murder. *State v. Chase,* 149 Me. 80, 99 A.2d 71 (1953).

An unjustified and unexcusable homicide which results from conduct which is reckless and has a high potential for killing is likewise murder. *State v. Lafferty,* Me., 309 A.2d 647, 671 (1973) (Wernick, J., concurring).

With respect to the state's position, the presiding justice was required to instruct the jury fully as to what was meant by unjustified; what was meant by unexcused; what was meant by intentional; what was meant by reckless conduct having a high potential for death.

All this he did.

Appellant's version of the circumstances under which Mrs. Lewisohn was killed created the need for instructions as to the legal effect of the facts alleged, if such version were accepted by the jury or if the recitation of such facts created in the minds of the jury a reasonable doubt that appellant was guilty of murder. If appellant's version of the circumstances surrounding the death was accepted, only one of two legal conclusions could result:

(a) appellant is guilty of no crime because his wife's death resulted from pure accident while he was doing a lawful act, i. e., cleaning a gun, and her death must be regarded in law as excusable homicide [*State v. Ela,* 136 Me. 303, 8 A.2d 589 (1939)];

(b) he is guilty of involuntary manslaughter because though the act of cleaning the gun was lawful, his conduct was in reckless disregard of the lives or safety of others, which recklessness was quite different in quality subjectively from that reckless conduct which can be an element of murder [*State v. Northup,* Me., 318 A.2d 489 (1974); *State v. Lafferty, supra* at 671–72].

As this court pointed out in *State v. Northup, supra* at 498:

"The manner in which the jury finds that the killing was committed determines its unlawfulness (if it was unlawful) and the jury may find that it was unlawful because it was an unjustified and unexcused intentional killing or that it was unlawful because it was within the criminality category of proscribed *involuntary* killings. There *is* no crime until the State has proved one of the elements which makes the killing unlawful and the issue of how death was caused should be submitted to the jury with instruction as to the nature of both voluntary and involuntary homicides."

(Emphasis in original.)

We note that at no time during his trial or in his brief or at oral argument before us has appellant claimed that the killing occurred while he, appellant, was "in the heat of passion." It follows that no "voluntary manslaughter" issue was ever generated. No instruction as to the rules of law governing "voluntary manslaughter" was appropriate. *State v. Park,* 159 Me. 328, 193 A.2d 1 (1963). The trial justice was aware at the time of trial that both the state and the appellant agreed that "voluntary manslaughter" was not an issue.

The rules of law governing what is traditionally referred to as "involuntary man-slaughter" most certainly should have been given. The jury should have been instructed in clear terms that involuntary manslaughter, when viewed in the context of the claimed facts described by appellant, is a homicide which results from conduct which is neither a felony nor which has high death-producing potential. Rather, it is conduct properly characterized as "criminal negligence." "Criminal negligence" is negligence of a higher degree than that required to establish liability in a civil suit. It is negligence which involves a reckless disregard for the lives or safety of others. *State v. Ellis,* Me., 325 A.2d 772 (1974). The reckless disregard for the lives or safety of others is different in quality subjectively from reckless conduct which, when viewed objectively, is considered in law to have the equivalent effect of a subjective intention to kill. *State v. Lafferty, supra* at 671–72, n.5. Reckless and wanton and willful conduct causing a homicide punishable as murder is regarded in law as such a serious disregard of the obligation to exercise reasonable care so as not to unreasonably endanger the lives or safety of others as to be tantamount to a subjective intention to kill and deserving the same punishment.

Unlike the situation in *State v. Northup, supra,* guilty of "involuntary manslaughter" was a viable choice of verdicts the jury could have reached on the evidence it has before it.

Instead of describing "involuntary manslaughter" either in terms above recited or equivalent language, the presiding justice paraphrased the language of former 17 M.R.S.A. § 2551, as follows:

"Whoever unlawfully kills a human being in the heat of passion or on sudden provocation without express or implied malice aforethought is guilty of manslaughter and shall be punished."

He prefaced this reading by saying, "I will read you the definition of manslaughter."

The reference statute to which the presiding justice alluded in his instructions to the jury described the elements of "voluntary manslaughter" which was never an issue in the case.

1216 ■ ▬

Substantially later in his instructions to the jury, the presiding justice said:

"Manslaughter consists of what we call blameworthy culpable acts which result in someone else's death, not as murder. Gross negligence will justify a manslaughter conviction if it involves a reckless disregard for the lives and safety of others. It is of a much higher degree of negligence than is required to prove _ _ required to be proved of a civil case."

However, he prefaced this instruction by saying, "And, so, now having read you the statute that defines manslaughter, I will read _ _ _ will try to explain to you what that means."

The first reference to manslaughter in the instructions doubtless implanted in the jury's mind the elements of voluntary manslaughter. It does so with words—"heat of passion, sudden provocation"—having immediately identifiable colloquial meaning to the lay person. The next time manslaughter was mentioned, it was not in the abstract but rather with reference to the statute previously read. This could only serve to reinforce the jury's original perception.

The gravamen of the fault which is found with the instruction is that the jury could properly have concluded the appellant was guilty of manslaughter, not murder, *only* if they found that at the time of the doing of the acts which brought about the death of Roslyn Lewisohn the appellant was "in the heat of passion on sudden provocation, without express or implied malice aforethought." This would naturally result from the fact that the presiding justice read only that portion of 17 M.R.S.A. § 2551 which described "voluntary manslaughter" and completely omitted the statutory reference to manslaughter as defined by the common law, i. e., "involuntary manslaughter." This is so even though he later undertook to discuss briefly the law of "involuntary manslaughter." In view of the fact that it was never contended that appellant acted while "in the heat of passion, on sudden provocation," a "murder" conviction could only result from the instructions given in the context of the claimed facts.

It follows, then, that the instructions given, when viewed as a whole, were so misleading as to be the equivalent of incorrect instructions on a vital point in the case. The instructions given were so fraught with potential for prejudice that the jury's verdict cannot be considered "a true thing said" under appropriate instructions. Only a new trial can remedy the patent defect in the conduct of the trial.