STATE OF MAINE *vs*. LEWIS L. ELA.

Somerset.      Opinion, October 9, 1939.

*George M. Davis*, County Attorney for the State.
*Edward S. Anthoine*,
*W. Folsom Merrill*, for respondent.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

STURGIS, J.   At *nisi prius*, the respondent, Lewis L. Ela, was tried and found guilty of manslaughter. The case comes before the Law Court for review on his appeals from the denial of a general and a special motion for a new trial.

Just before eight o'clock, daylight saving time, of the morning of September 11, 1938, as the respondent drove the heavy passenger bus, which he was operating, through a ground fog on the state highway between Burnham and Pittsfield, the bus collided with a Ford sedan apparently driven by Joseph Pullman, the deceased. The sedan rebounded, was pushed back off the road and turned over, while the bus continued on, crashed into an automobile which was following the decedent's car and came to a stop. Joseph Pullman was instantly killed.

The bus which the respondent was driving was eight feet wide, about thirty-one feet long and weighed approximately seven tons. It was a passenger bus but on this morning was en route from Boston to Bangor loaded only with newspapers for delivery at various distributing points along the way. The driver and a helper were the only occupants. The bus was apparently in good mechanical condition, its brakes were working properly, and when the collision occurred its headlights were on.

It was Sunday morning, the weather was fair, and although the sun was shining brightly, in places there were fog banks, some light affecting visibility little if any, and others heavy and dense. The fog where the cars came together seems to be accurately described by the driver of an automobile which went through it just ahead of the bus, in these words: "As you went into this fog you could see it; you could see that you were coming into fog, but, as you went into it, your visibility or your ability to see ahead was not impaired very much, but, as you went into it, it got thicker suddenly. It was just like going into a darkened room. There was a core in the center of the fog that was — the visibility was — why, you just simply couldn't see." This man further states that the fog was so thick in the core that he could not see the car which was immediately in front of him or even a reflection of his headlights on its rear bumper, and the cars which were in collision could not be seen until they were passing him. This description of the fog is fully confirmed throughout the record.

This man is also the only adult person other than the respondent and his helper who is able to furnish any information as to the operation of the bus and the car in which the decedent was killed just prior to the accident. He states that driving along towards Pittsfield and preceded by two other automobiles going in the same direction, from about the time he left Burnham he noticed that the bus was following close behind his car and at all times near enough to be seen in his rear view mirror. As he entered the fog, he slowed his car down to a speed of about thirty-five miles an hour and in his mirror saw that the bus was then on its right-hand side of the road and reducing its speed. He did not again look back but, entering the core of the fog bank and driving on the right-hand side of the road about six inches off the center line, suddenly met two automobiles coming from the opposite direction, which passed by on the opposite lane of the road clearing

his car by not more than three feet, and both were travelling at high speed. As the second car went by, there was a crash back down the road and in a fraction of a second this automobile also collided with the bus. Driving his car ahead into a yard by the road, this man quickly returned to the scene of the accident and assisted in stopping oncoming traffic.

The State contends that just prior to its collision with the car in which the decedent died the respondent turned the bus he was operating to the left and across the center line of the highway to pass the car ahead which it was following, and drove it directly into the path of the automobiles coming from the opposite direction. Both of these cars, the attorney for the State insists in argument, after passing the car ahead of the bus continued on down the westerly lane and two and one-half feet from the center line of the highway. As the brief reads, this "is precisely where the State contends they [these automobiles] were" when they collided with the bus.

The State first called to the stand a ten- or eleven-year-old girl who was riding on the back seat of the car which went into the fog just ahead of the bus and was driven by her father, whose description of the fog bank and other incidents of the collision have been related. This child said that as she rode along, occasionally she looked back through the rear window and watched the bus following on behind. Just before the collisions, being then turned towards the front of the car, she saw two automobiles coming, turned around to see the bus, noticed it was turning out to the left to go around the car in which she was riding, and turned back to speak to her father when she heard a crash. The child can not, however, tell how far back the bus was when, as she says, she saw it turning to the left, nor how long before the collision this turn was made. Her testimony must be read in the light of the fact that whatever happened just prior to this accident took place in a dense fog where visibility was practically blotted out or reduced to a minimum. If this child's assertion that she saw the approaching cars, turned and saw the bus swinging to the left, and turned back to speak to her father is analyzed, it is apparent that it should be given little weight. In the dense fog as described, there is much doubt whether the bus could have been seen or the course of its travel determined with any degree of accuracy. Although the honest intention of this young girl to speak the truth can

not be questioned, unfortunately the undisputed facts bar an acceptance of her testimony as reasonably correct and credible.

The State introduced numerous photographs with measurements and statements of observers of marks on the surface of the highway indicating that the collisions occurred on the west or left lane of the highway looking towards Pittsfield. It was shown that marks of various kinds, the easterly one three feet and eight and one-quarter inches west of the center line of the road ran back seventy-two feet in more or less of an arc out over the shoulder and to the Ford sedan in which the decedent was killed. Although it would seem probable that this car was in the west lane when it was hit and that these marks, or part of them at least, were made by its tires and broken underbody as it was hurled back up and off the road, the marks furnish no convincing proof that the sedan was several feet from the center line of the road at the time of the collision or what its course was prior thereto. It may be assumed that the impact when the car and bus came together was terrific and the rebound of the light automobile substantial. We can not believe that the Ford sedan was not diverted from its position in the highway when the collision came or was driven backwards along the same course it had followed in its approach.

The State also showed through the same photographs and observers that there were tire marks leading back northerly approximately eighty-five feet from or near the point of collision, all the way on or just easterly of the center line of the road. For a part of this distance, these marks formed a single, in places broken, track of wide black smootches made, it would appear, by one of the front tires of the bus. Then for a few feet a double track was found which, it must be inferred, was caused by one set of the dual tires with which the rear wheels of the bus were equipped. Back of that was a single tire track forty-five feet long. This entire broken but otherwise continuous line of tracks, the State claims, was made by the wheels on the right side of the bus and demonstrates that when these collisions took place the whole of the bus was on the wrong side of the road.

This Court is not of the opinion that the contention of the State as to tire marks made by the bus can be reconciled with other evidence in the record. The bus was struck only on its extreme left front and side. The end of its front spring there was damaged and the mud-

guard beside it bent down and the headlight just above turned back against the hood. The left front tire was blown out and the front axle on that side pushed back, forcing the wheel against the body where it was wedged in by the fender brace. Although the left side of the shell of the radiator was slightly bent, neither its core nor the number plates hanging down directly in front of it were damaged, nor can marks of the collision be seen elsewhere on the body or chassis. And the same seems to be true of the automobiles which collided with the bus. Apparently, each was struck on its left front end. None of the vehicles show the damage which would have necessarily resulted if the right wheels of the bus were on the center line of the concrete with it full width of eight feet out into the west lane. The more reasonable inference to be drawn from this evidence is, we think, that it was the wheels on the left side of the bus which were on or just off the center line of the concrete with only a small part of the body projecting into the west lane when the collision with the Ford sedan occurred. This conclusion avoids the mathematical and physical improbabilities of the State's contention.

The respondent, taking the stand in his own defense, denies that he made any attempt to turn out and pass the car which was immediately ahead of him, but says that following along back of it a distance of about forty feet, with diminished speed and all lights burning he entered and drove through the fog in the easterly lane of the highway and just to the right of the center line, following that line by the guidepost on his left front fender. He states that he saw the car in which the deceased was killed just as it passed the rear end of the car ahead, and his account of the collision is that the oncoming car came directly towards the bus, crashed into its left front fender, was driven up into the air and then pushed back up the road until it veered out to the left-hand side of the way and into the ditch. He continues by saying that his left front tire was blown out by this collision and the front axle of the bus on the left-hand side was pushed back against the body where it was wedged in by the fender brace. He adds with insistence that the air brakes with which the bus was equipped ceased to operate at the same time, and with the bus in this condition he was able to hold it in a straight course for only a short distance when it veered to the left over into the west lane and collided with the second automobile. This car he did not see until it was with-

in ten feet of the bus. Further extended review of the respondent's testimony is unnecessary and comment thereon can well be brief. Regardless of when the left front tire of the bus blew out and the air brakes were broken, with all doubts resolved in the respondent's favor, the evidence shows clearly that he was not driving to the right of the center line of the highway when the decedent's car was hit, but with the left wheels of the bus on that center line. The tires on those wheels were wider than their treads and the mudguards and body extended still farther out. The bus was, to some extent, over on the wrong side of the road.

This Court is not of the opinion that in this case the State has proved that the respondent, Lewis L. Ela, was guilty of the gross or culpable negligence which it is necessary to establish to sustain his conviction for manslaughter. Gross or culpable negligence in criminal law involves a reckless disregard for the lives or safety of others. It is negligence of a higher degree than that required to establish liability upon a mere civil issue. *State* v. *Wright*, 128 Me., 404, 148 A., 141 ; *People* v. *Sikes*, 328 Ill., 64, 159 N. E., 293 ; *Aiken* v. *Street Railway*, 184 Mass., 271, 68 N. E., 238 ; *People* v. *Campbell*, 237 Mich., 424, 212 N. W., 97 ; *State* v. *Lester*, 127 Minn., 282, 149 N. W., 297.

As already pointed out, the facts proven in this case and inferences reasonably to be drawn therefrom strongly indicate that the respondent was driving the bus he was operating practically on the right side of the road when the accident occurred in which the decedent was killed. He failed, however, to keep it entirely off the other lane in which the decedent had the right of way. He was driving through a blinding fog under conditions that undoubtedly made it extremely difficult for him to determine his exact position in the road. It may well be that by the exercise of greater care and caution he could have kept the whole of the bus on its own side of the road. That he failed in this regard does not, however, we think, show a reckless disregard of the safety of other travellers on the way. It can be properly viewed as inattention and inadvertence only, for which a civil action for negligence might lie. That we can not and do not here decide.

The State has relied on circumstantial evidence to establish the guilt of the accused. The facts proven and the inferences reasonably

to be drawn therefrom do not point irresistibly to that fact. A belief that he was not criminally negligent is not excluded beyond a reasonable doubt. The presumption that he is innocent remains unbroken.

It is unnecessary to pass upon the special motion for a new trial on the ground of newly-discovered evidence. The appeal from the denial of the general motion must be sustained and a new trial granted.

*Appeal from denial of general motion for new trial sustained.*