**STATE of Maine**

v.

**Robert P. HARRINGTON.**

Supreme Judicial Court of Maine.

Argued Nov. 3, 1981.

Decided Feb. 12, 1982.

As Corrected March 31, 1982.

presented pursuant to M.R.Crim.P. 41(e) or in a plenary proceeding.

**1.** The presiding justice acted in response to defendant's motion for a new trial. Under

Herbert Bunker, Jr., Charles K. Leadbetter, Asst. Attys. Gen. (orally), Augusta, for plaintiff.

Richard P. Sullivan (orally), Biddeford, for defendant.

Before McKUSICK, C. J., and GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ.

McKUSICK, Chief Justice.

A Superior Court jury in York County found defendant guilty of criminally negligent manslaughter, 17–A M.R.S.A. § 203(1)(A) (Supp.1980), but the presiding justice entered a judgment of acquittal notwithstanding the verdict, on the ground that the evidence was insufficient to convict.[1] The State brings this appeal, pursu-

M.R.Crim.P. 29(b), "[a] motion for new trial *shall be deemed to include a motion for judgment of acquittal as an alternative.*"

ant to 15 M.R.S.A. § 2115–A(2) (1980) and M.R.Crim.P. 37B. We reverse the judgment of acquittal and reinstate the jury verdict.

On January 16, 1981, defendant visited the Sanford home of one of his friends in the company of another friend, Thomas Mellon. Defendant and Mellon had been drinking beer before arriving, and continued while at the friend's home, though there is no evidence that either was drunk. Defendant became intrigued by a shotgun hanging in a gun rack on the living room wall. With Mellon just a few feet away in the kitchen and two other men working overhead in the attic, he removed the weapon and began inspecting it. The gun discharged, fatally wounding Mellon, who had moved in front of the gun while defendant was handling it.

We have recently stated the standard of review on an appeal by the State from a judgment of acquittal notwithstanding the verdict as follows:

> The test of ... legal sufficiency is whether on the evidence as a whole, assessed most favorably to the State, a jury acting rationally could not avoid having a reasonable doubt as to defendant's guilt.

*State v. Howes*, Me., 432 A.2d 419, 424 (1981). This appellate court applies the same standard in reviewing a judgment notwithstanding the verdict as the presiding justice was obliged to apply in granting it. Generally, no deference is owed the presiding justice's determination. The requirement that the evidence be viewed in the light most favorable to the State negates the significance of the presiding justice's opportunity to observe witness demeanor, except in the extraordinary circumstance that the trial court could conclude that a witness's credibility had been so thoroughly impeached that the jury could not rationally give any weight to his testimony. Conversely, much deference is owed the findings of a properly instructed jury acting on competent evidence without suggestion of misconduct.

Criminally negligent manslaughter exists when one by his conduct causes the death of another and fails to be aware of the risk posed by that conduct. 17–A M.R.S.A. §§ 10(4)(A), 203(1)(A) (Supp.1980).[2] The failure to be aware of the risk, "when viewed in the light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation." *Id.*, § 10(4)(C). Many facts brought out at trial support the jury in finding defendant guilty by that standard. The owner of the gun testified that he believed he had left the gun's safety in the "on" position, which suggests that defendant must have turned it off to fire the weapon. Defendant claimed not to have pulled the trigger, but he also admitted to knowing that he could open the chamber by depressing the trigger with the safety on. A firearms expert testified that the gun could not be fired except by pulling the trigger. The jury could rationally have concluded that defendant, attempting as he claimed he was to open the chamber and determine whether the gun was loaded, inadvertently turned the safety off, then pulled the trigger, causing the shotgun to fire.

The State also established that defendant was familiar with firearms generally; had never inspected this gun and so should have been very cautious with it; had no reason to believe the gun was unloaded; could easily have turned the gun over to see that the tubular magazine, at least, was loaded; and did not check to be sure there was no one in the potential line of fire before handling the gun. The jury did not have to believe all of this evidence to conclude rationally, beyond a reasonable doubt, that defendant deviated grossly from the standard of conduct that a reasonable and prudent person would have observed in the same situation.

2. Section 10(4)(A) has been moved to become 17–A M.R.S.A. § 35(4)(A) (Supp.1981). Section 203(1)(A) has not been changed.

 The evidence, assessed most favorably to the State, could convince a rational factfinder of defendant's guilt beyond a reasonable doubt. The record does not suggest that the jurors were improperly instructed, or engaged in any misconduct, or acted in anything less than the sober, thoughtful manner that befits their high function.[3] Under these circumstances, it was error for the presiding justice to unseat the jury's verdict of guilt.

The entry must be:

Judgment of acquittal notwithstanding the verdict reversed; case remanded for entry of judgment of conviction on the jury verdict.

NICHOLS, CARTER, WATHEN, JJ., concurring.

VIOLETTE, J., with whom GODFREY, J., joins, dissenting.

VIOLETTE, Justice, with whom GODFREY, Justice, joins, dissenting.

I would affirm the judgment of acquittal notwithstanding the jury verdict of guilty of criminally negligent manslaughter (17-A M.R.S.A. § 203(1)(A)), entered by the presiding trial justice upon a timely motion filed after trial, upon his finding that the evidence was insufficient to sustain the conviction.

Although the facts are not in dispute, their importance cannot be overstated and I therefore lay them out in some detail. On January 16, 1981, between 12:30 and 1:00 p. m., the defendant and his close friend Tom Mellon, the deceased, arrived at the apartment of Donald Sanfacon, one of the defendant's friends. Already present at the apartment were Sanfacon, John Fanjoy (Sanfacon's landlord), and a Mr. Bedell. The five men sat around the kitchen table talking and drinking beer. Mr. Bedell left at about 2:00 p. m. Shortly thereafter Don-ald Sanfacon and John Fanjoy left the group and went into the attic of the house to do some electrical wiring work. Mellon and defendant remained seated at the table. A short time after Sanfacon and Fanjoy had left the apartment, the defendant arose from the table and went into the adjoining living room to turn on the television for music. On the living room wall, above a couch, was a gun rack holding two shotguns. The defendant, who had been a frequent overnight guest of Donald Sanfacon and had seen the guns many times over the past year, had never examined the guns closely. More importantly, he had never known the guns to be loaded. On his way back to the kitchen, the defendant took down one of the guns, a 16 gauge pump action shotgun, to examine it. Unknown to him, Donald Sanfacon had fully loaded the weapon two weeks prior to this incident, placing one shell in the chamber and four in the tubular magazine under the barrel. Donald Sanfacon testified that he was not positive that he had put the safety on when he returned the gun to the rack but said it was his practice to do so. The defendant testified that he stood in front of the couch and took the gun from the rack intending to put it to his shoulder. Before raising the gun to his shoulder, he began to examine the gun to see if it was loaded. Because he was left handed, he had the gun in the crook of his right arm with his right hand on the pump and his left hand around the stock; the gun was pointed toward the kitchen where the stove stood. The defendant testified that he thought Mellon was still seated at the table and was not in his line of sight. He did not check the safety, presuming it was on "safe", but did check to see if there was a shell in the chamber. He did so by trying to pull the slide action back but testified that it would not move. As he was attempting to move the slide

---

3. In his opinion ordering the judgment of acquittal n. o. v., the presiding justice expressed concern that some jurors may have found offensive the crude four-letter word frequently used by defendant in a tape-recorded statement to the police that was played at trial. Defendant did not object to the admission of the state-ment, and neither below nor before this court has he urged it as grounds for a new trial. The presiding justice did not find the admission to be error, and neither do we. The justice's concern did not, of course, go to the sufficiency of the evidence to convict.

release button, located about one-half inch from the trigger, and pull the action back, the gun went off. The defendant stated that he did not pull the trigger, however, the State's firearms expert testified that the gun could not be fired without pulling the trigger. The amount of time which elapsed from the time the defendant rose from the table until the gun went off was between 10 to 15 seconds. During this short period of time the victim had risen and moved from his seat at the table after the defendant entered the living room unbeknownst to the defendant. The State's expert witness theorized that Mellon was standing in a stooped position, near the kitchen range and table, when the shot struck him in the left part of the back below the shoulder blade. The victim died as a result of his wound several hours later.

The defendant although not a regular hunter nor a gun owner, had some basic knowledge of firearms acquired while he was in the Navy. More importantly, the defendant was not familiar with the type of gun involved in the incident. The gun was a Ward 16 gauge pump action shotgun, manufactured approximately twenty-five years ago. The State's firearms expert testified that it was the only model of shotgun he had ever come in contact with that had such a design in removing a shell from the chamber without pulling the trigger. It was a complicated maneuver requiring putting tension on the slide action by pushing it forward and upward, while at the same time depressing the slide action release button (located one-half inch from the trigger), before being able to pull the slide action backward to extract the shell from the chamber. A person could see if there were shells in the magazine by examining the bottom of the tubular magazine. The defendant did not examine the bottom of the magazine. When asked if he was aware of any defects or problems with the gun, Donald Sanfacon testified: "it's worn to some degree and it will catch [referring to the slide action]." Donald Sanfacon further testified that he had never left the gun in the rack loaded before and acknowledged that it was not a safe practice.

The majority opinion properly states the essential elements of the offense of criminally negligent manslaughter. The sole issue presented on appeal is whether a rational trier of fact could find that the defendant's failure to be aware of the risk he took constituted a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

A persistent problem, faced by the courts and legislatures alike, has been the formulation of the "extra" qualities that distinguish unintended homicides which give rise to criminal liability, from those which at most, produce civil liability for negligence. In *State v. Davis*, Me., 398 A.2d 1218, 1219 n.3 (1979) we said: "Given the Legislature's plain determination ... to require something more than ordinary 'civil' negligence to trigger criminal liability, and the well recognized rule of statutory construction dictating that criminal statutes be strictly construed in favor of the defendant, [citations omitted] we decide that criminal liability ... cannot arise from ordinary negligence in the civil sense." Whether, under the circumstances of a particular case, one fails to be aware of a risk that his conduct will result in causing death, and whether that failure to perceive such a risk was such as to constitute a gross deviation from the standard of care which a reasonable man would have observed under the same circumstances are questions generally left to the trier of fact. This Court is justified, however, in setting aside a verdict of guilty when the evidence is insufficient to permit a finding that defendant's conduct amounted to a gross deviation. *See State v. Ela*, 136 Me. 303, 308, 8 A.2d 589, 592 (1939) (Court of the opinion that State failed to prove conduct which would sustain conviction for manslaughter).

Applying the *State v. Howes*, Me., 432 A.2d 419, 424 (1981) standard of review which is set forth in the majority opinion, it is my judgment that the facts of this case cannot support a verdict of guilty. Neither the act of defendant in removing the gun from its rack nor his handling of the gun in

his attempt to determine if it was loaded were acts of gross deviation from the standard of conduct that a reasonable and prudent person would have observed in the same situation. Moreover, the fact that these acts occurred in an apartment is not sufficient to elevate the defendant's conduct to a criminal level. Even though the defendant had no reasonable expectation that the gun was loaded, he still sought to determine if it was in fact loaded. The defendant did not know that the gun was of unusual design, that it did not operate as a standard pump shotgun, and that it sometimes "caught". Further, he did not aim the gun at anyone. But for the fortuitous movement of Mellon from his seat at the table to another place in the kitchen during the few seconds of this episode, no one would have been injured by the clearly accidental discharge of the gun. As to the discharge of the gun, the defendant may have been civilly negligent. One could reasonably infer that he inadvertently pulled the trigger while attempting to pull back the slide action. Nevertheless, I cannot agree with my brethren that this conduct rose to the level of gross deviation as defined in 17–A M.R.S.A. § 10(4)(C).

This case is clearly distinguishable from *State v. Perfetto*, Me., 424 A.2d 1095 (1981). In that case the gross deviation which resulted in the verdict of guilty of criminally negligent manslaughter was the conscious and deliberate firing of a gun by a hunter while out hunting without knowing at what he was firing. In that case, the defendant aimed and shot at what he thought was a game animal and instead killed a fellow hunter. In this case, the defendant did not aim the gun at anyone nor did he ever intend to fire it.

In my judgment, the conduct of the defendant, notwithstanding its tragic results, did not rise to the level of criminal negligence.